**ROI V. SIMMONDS, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Crim. No. 2008-008
Supreme Court of the Virgin Islands
May 4, 2010

550

DARREN JOHN-BAPTISTE, ESQ., The Practice, PLLC, St. Thomas, USVI, *Attorney for Appellant.*

RICHARD S. DAVIS, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice*. SWAN, *Associate Justice, dissenting.*

## OPINION OF THE COURT

(May 4, 2010)

CABRET, *J.* Following a warrantless search of Roi Simmonds' back yard, enforcement officers from the Virgin Islands Waste Management Authority ("WMA") issued him a citation for accumulating waste on his property. Simmonds moved to suppress evidence obtained as a result of the search, arguing that the officers violated his rights under the Fourth

Amendment to the United States Constitution. The Superior Court denied Simmonds' motion to suppress, and after a bench trial, found him guilty of the charge. Simmonds filed this appeal, asserting that the Superior Court erred in denying his motion to suppress. Because we agree with Simmonds that the Fourth Amendment prohibited the officers' warrantless search of his back yard, we will reverse his conviction.

## I. FACTS AND PROCEDURAL HISTORY

The search at issue occurred on August 29, 2007. On that day, law enforcement officers from the Virgin Islands Police Department Abandoned Vehicle Task Force and the WMA converged on the Frydendahl area of St. Thomas in a concerted response to numerous complaints of junk vehicles and other waste accumulating in the area. Simmonds resided in Frydendahl, and after a police officer apparently observed what he believed was accumulated waste on Simmonds' property, WMA Enforcement Officer Clarence Husband was dispatched to Simmonds' home to investigate the matter.

As Officer Husband approached Simmonds' home from a public road, he "observed numerous abandoned vehicles, household appliances, junk wood, and [that] the yard was in a terrible condition." (J.A. at 106.) Although Simmonds' property is mostly surrounded by a fence, Officer Husband pulled his car into a "drive-in area" where there was no fence. Simmonds was in his front yard when Officer Husband arrived. (J.A. at 106.) Officer Husband approached Simmonds and attempted to explain to him that he needed to clean up his yard, but Simmonds replied that he could keep whatever he wanted on his property and he asked Husband to leave. Notwithstanding Simmonds' request, Officer Husband remained on Simmonds' property and called for his partner, Officer Jarmel Rubaine, to assist him.

Shortly thereafter, Officer Rubaine arrived at Simmonds' home with a camera to photograph the alleged violations. Rubaine and Husband walked around the side of Simmonds' house and into the back yard where Rubaine took photographs of several dilapidated vehicles and what Rubaine claimed were piles of rotted, termite infested wood and other debris. When Simmonds asked why photographs were being taken, Officer Husband told him that he was going to be cited for the accumulation of waste and that the officers "always take pictures of situations like that." (J.A. at 130.) After the photographs were taken,

Officer Husband issued Simmonds a citation for accumulating waste on his property.[1] It is undisputed that Simmonds did not consent to the officers entering his back yard and taking photographs and that all of the photographs were taken from Simmonds' back yard.

Prior to trial on the charge, Simmonds filed a motion in limine arguing, among other points, that the officers' warrantless search of his back yard violated his Fourth Amendment rights and that the unlawfully obtained evidence must be suppressed. The People of the Virgin Islands responded that the WMA officers did not violate Simmonds' rights because the violations were in plain view and because the officers were authorized to enter Simmonds' yard, "knock on [his] door and then talk to him about the reports of waste" under the " 'knock and talk' . . . exception to the Fourth Amendment warrant requirement." (J.A. at 48.)

At a bench trial on the charge, the trial judge stated that he was going to take Simmonds' motion to suppress under advisement and hear evidence on the alleged violation.[2] The evidence consisted of the officers' testimony recounting what transpired on the day they visited Simmonds' home. The officers also described the waste they observed on Simmonds' property, and the People tendered into evidence the photographs they took of the alleged waste.

On January 25, 2008, the Superior Court entered a judgment denying Simmonds' motion to suppress and finding him guilty of the charged offense. In denying Simmonds' motion, the Superior Court reasoned that the officers were permitted to enter Simmonds' property under the knock and talk exception to the warrant requirement. The court further reasoned

---

[1] Although the citation does not identify the statute that Simmonds was charged with violating, the record shows that he was charged under title 19 section 1563(5) of the Virgin Islands Code, which provides in pertinent part:

> No person shall . . . cause, suffer or permit the accumulation, on premises under his management or control as owner, lessee, contractor or otherwise, of waste which because of its character or condition may invite the breeding or collection of flies, mosquitoes or rodents, or which may in any other manner prejudice the public health.

A violation of this section is a misdemeanor which can result in a fine of $1,000 for each offense and incarceration of up to 180 days. V.I. CODE ANN. tit. 19, § 1562(a) (Supp. 2008).

[2] Simmonds also moved to exclude evidence of the photographs on the ground that the People did not provide him with copies of the photographs during discovery. Because we conclude that the photographs should have been suppressed on Fourth Amendment grounds, we need not address Simmonds' assertion that the trial court also erred in admitting the photographs due to the alleged discovery violations.

554

that, because the waste violations were in plain view once the officers entered the property, they were authorized to collect evidence despite Simmonds' verbal objections. The Superior Court subsequently sentenced Simmonds to, *inter alia*, a suspended thirty day prison term, a $1,000 fine, eighty hours of litter gathering and numerous directives that Simmonds clear his yard of debris. This appeal ensued.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which provides that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." In reviewing the trial court's denial of Simmonds' motion to suppress, we review its factual findings for clear error and exercise plenary review over its legal determinations. *See United States v. Shabazz*, 564 F.3d 280, 286 n.4 (3d Cir. 2009) (citing *United States v. Lafferty*, 503 F.3d 293, 298 (3d Cir. 2007)).

## III. DISCUSSION

■ It is beyond debate that individuals have a reasonable expectation of privacy in their homes. *See United States v. Karo*, 468 U.S. 705, 714, 104 S. Ct. 3296, 3303, 82 L. Ed. 2d 530 (1984). This expectation of privacy is rooted in, and protected by the Fourth Amendment to the United States Constitution, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment is made applicable to the Virgin Islands pursuant to section 3 of the Revised Organic Act of 1954.[3] The Fourth Amendment generally protects individuals from "governmental intrusion not authorized by

---

[3] The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1995), *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 73-177 (1995) (preceding V.I. CODE ANN. tit. 1).

a warrant," and the decisions of the United States Supreme Court "have not deviated from this basic Fourth Amendment principle. Searches and seizures inside a home without a warrant are presumptively unreasonable absent exigent circumstances." *Karo*, 468 U.S. at 714-15, 104 S. Ct. at 3303. (citing *Welsh v. Wisconsin*, 466 U.S. 740, 748-749, 104 S. Ct. 2091, 2097, 80 L. Ed. 2d 732 (1984); *Steagald v. United States*, 451 U.S. 204, 211-212, 101 S. Ct. 1642, 1647-1648, 68 L. Ed. 2d 38 (1981); *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980)).

■ The Fourth Amendment's shield from unreasonable government intrusion, however, is not confined to the inside of a home, but extends to the curtilage. *United States v. Dunn*, 480 U.S. 294, 300, 107 S. Ct. 1134, 1139, 94 L. Ed. 2d 326 (1987) (citing *Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 1742, 80 L. Ed. 2d 214 (1984)).

> At common law, the curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of [sic] home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private.

*Oliver*, 466 U.S. at 180, 104 S. Ct. at 1742 (citations and quotation marks omitted). These factors are:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing.

*Dunn*, 480 U.S. at 301, 107 S. Ct. at 1139. " '[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage-as the area around the home to which the activity of home life extends-is a familiar one easily understood from our daily experience.' " 480 U.S. at 302, 107 S. Ct. at 1140 (quoting *Oliver*, 466 U.S. at 182 n.12, 104 S. Ct. at 1743 n.12)). It is within this area that people have a legitimate expectation of privacy. *Est. of Smith v. Marasco*, 430 F.3d 140, 156 n.14 (3d

Cir. 2005) (citing *Dunn*, 480 U.S. at 300, 107 S. Ct. at 1139). Whether an area is included within the curtilage is a question of fact that we review for clear error. *United States v. Benish*, 5 F.3d 20, 23-24 (3d Cir. 1993).

 In the instant case, the Superior Court found that the area where the photographs were taken was within the curtilage of Simmonds' home, and the People do not contest this finding on appeal.[4] In fact, the record indicates that the area in question, which provided the vantage point from where the officers took the photographs, was: (1) immediately outside Simmonds' home, (2) in his back yard, and (3) enclosed by a fence. These three factors are strong indications that the area in question should be treated as an extension of Simmonds' home for Fourth Amendment purposes. *See Oliver*, 466 U.S. at 178, 104 S. Ct. at 1741 (recognizing that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, *except in the area immediately surrounding the home*." (emphasis added)); *United States v. Jenkins*, 124 F.3d 768, 772-73 (6th Cir.1997) (finding that a fenced backyard area immediately outside the home was within the curtilage); *Brocuglio v. Proulx*, 478 F. Supp. 2d 297, 304 (D.Conn. 2007) (observing that "although there may not be an actual legal presumption that a fenced-in back yard is curtilage, curtilage is often defined as the area immediately adjoining the home"). Although the evidence also showed that Simmonds stored lumber and vehicles in this area, because the other three factors all indicate that this was an area which should be considered an extension of the home for Fourth Amendment purposes, the Superior Court did not clearly err in concluding that it was within the curtilage.[5]

---

[4] Notwithstanding the Superior Court's finding that the photographs were taken within the curtilage of Simmonds' home, the dissent concludes that Simmonds had no expectation of privacy in this area. The dissent, however, never addresses whether the Superior Court's finding of fact was clearly erroneous.

[5] We note that, while the proximity of the backyard area to Simmonds' home and the presence of a fence establish that the trial court's finding in this case was not clearly erroneous, the factors relevant to the curtilage determination must be applied on a case-by-case basis. *See United States v. Depew*, 8 F.3d 1424, 1426 (9th Cir. 1993) (recognizing that "[e]very curtilage determination is distinctive and stands or falls on its own unique set of facts"). As pointed out by the United States Supreme Court in *Dunn*, the four- factor test does not:

produce[ ] a finely tuned formula that, when mechanically applied, yields a correct answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant

557

■ Notwithstanding our conclusion that Simmonds' back yard was within the curtilage of his home, it appears that the officers observed, from outside the curtilage, some of the alleged waste which Simmonds stored in his back yard. Indeed, both officers testified that they could see some of the alleged violations from the public road before they even entered Simmonds' property. The officers unquestionably had a right to be on the public road fronting Simmonds' home, and the Fourth Amendment did not curtail their right to make observations from that vantage point. *See Dunn*, 480 U.S. at 304, 107 S. Ct. 1134) ("as long as officers were 'standing . . . in the open fields, the Constitution did not forbid [the officers] to observe' the area assumed to be curtilage");[6] *California v. Ciraolo*, 476 U.S. 207, 213, 106 S. Ct. 1809, 1812, 90 L. Ed. 2d 210 (1986) (recognizing that the Fourth Amendment does not require that "law enforcement officers . . . shield their eyes when passing by a home on public thoroughfares."); *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 601 (6th Cir. 1998) (citing *Dunn*, 480 U.S. at 304, 107 S. Ct. 1134, for the proposition that "officers may constitutionally view a protected area as long as they make their observations from a lawful vantage point-i.e., a place located outside of the curtilage").

■ Likewise, Officer Husband had the right to approach Simmonds in his front yard and speak with him about the violations, and any observations made from that vantage point would not have violated Simmonds' Fourth Amendment rights. Under the "knock and talk" doctrine, relied upon by the Superior Court in the instant case,

> [o]fficers are allowed to knock on a residence's door or otherwise ap-
> proach the residence seeking to speak to the inhabitants just as any
> private citizen may. According to one scholar, "when the police come
> on to private property to conduct an investigation or for some other
> legitimate purpose and restrict their movements to places visitors
> could be expected to go (*e.g.*, walkways, driveways, porches), obser-

---

consideration-whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection. *Dunn*, 480 U.S. at 301, 107 S. Ct. at 1139-40.

[6] " '[T]he term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech.' " *Dunn*, 480 U.S. at 304, 107 S. Ct. at 1141 (quoting *Oliver*, 466 U.S. at 180 n.11, 104 S. Ct. at 1742 n.11).

vations made from such vantage points are not covered by the Fourth Amendment."

*Est. of Smith v. Morasco,* 318 F.3d 497, 519 (3d Cir. 2003) (quoting Wayne R. LaFave, 1 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 2.3(f) (3d ed. & Supp. 2003)). Thus, as with the roadside observations, any observations the officers made from the vantage point they enjoyed while talking with Simmonds' in his front yard would have been permitted by the Fourth Amendment. *See id.; United States v. French,* 291 F.3d 945, 953 (7th Cir. 2002) ("it is not objectionable for an officer to come upon that part of [private] property which has been opened to public common use. The route which any visitor or delivery man would use is not private in the Fourth Amendment sense, and thus if police take that route for the purpose of making a general inquiry or for some other legitimate reason, they are free to keep their eyes open." (citation and quotation marks omitted)).

█ But the salient question in this appeal does not concern the *observations* the officers made from the public road or from Simmonds' front yard. Rather, at issue is the evidence gathered from Simmonds' back yard: the observations the officers made after they entered the back yard and the photographs they took from that vantage point. Even if the officers, while standing in the public road or in Simmonds' front yard, observed violations situated within Simmonds' back yard, those observations would have merely provided probable cause, not authorization for a warrantless search of the curtilage. *See United States v. Whaley,* 781 F.2d 417, 419 (5th Cir. 1986) ("the mere observation of [marijuana plants] from the road or driveway would not justify entry into the home or curtilage to search or to seize property found there. That would have given probable cause to support a warrant." (citation omitted)); *Morgan v. State,* 285 Ga. App. 254, 645 S.E.2d 745, 748) (2007) ("the officer's initial plain view observations from the driveway and road, in and of themselves, did not authorize the officer to then make a warrantless entry into Morgan's backyard-a location undisputably [sic] within the curtilage surrounding the residence-and take steps culminating in the dogs there being seized and removed from the property.").

█ Furthermore, even if the officers were armed with probable cause based on their permissible observations from outside the curtilage of waste in Simmonds' back yard, a warrantless search or seizure within the

back yard was "presumptively unreasonable" absent Simmonds' consent or exigent circumstances. *Karo*, 468 U.S. at 717, 104 S. Ct. at 3304 (listing certain automobile searches, consensual searches and exigent circumstances as examples of the limited exceptions to the warrant requirement recognized by the Supreme Court); *accord United States v. Coles*, 437 F.3d 361, 365-66 (3d Cir. 2006) ("Warrantless searches and seizures inside someone's home . . . are presumptively unreasonable unless the occupants consent or probable cause *and* exigent circumstances exist to justify the intrusion." (citing *Steagald*, 451 U.S. at 211, 101 S. Ct. at 1647; *Payton*, 445 U.S. at 586, 100 S. Ct. at 1380); *United States v. Rubin*, 474 F.2d 262, 268 (3d Cir. 1973) ("Probable cause to believe contraband is present is necessary to justify a warrantless search, but it alone is not sufficient . . . . Mere probable cause does not provide the exigent circumstances necessary to justify a search without a warrant."). In this case, it is undisputed that Simmonds did not consent to the officers entering his back yard. In fact, prior to the warrantless entry, Simmonds told Officer Husband to leave his property. Thus, the warrantless entry into Simmonds back yard could only have been justified, if at all, by exigent circumstances.

■ As they relate to the circumstance of this case, "[e]xamples of exigent circumstances include . . . the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." *Coles*, 437 F.3d at 366 (citing *United States v. Richard*, 994 F.2d 244, 247-48 (5th Cir. 1993)); *accord United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002) (recognizing that exigent circumstances will justify a warrantless entry, search or seizure when, among other situations, officers "acting on probable cause and in good faith, reasonably believe from the totality of the circumstances that (a) evidence or contraband will imminently be destroyed or (b) the nature of the crime or character of the suspect(s) pose a risk of danger to the arresting officers or third persons." (citation and quotation marks omitted).

■ Although the Superior Court in this case did not consider the question of exigent circumstances, it is abundantly clear from the record that there were no exigent circumstances justifying the officers' warrantless search of Simmonds' back yard. Simmonds was being investigated for accumulating waste on his property. This waste, which allegedly consisted of dilapidated vehicles and piles of rotting lumber, posed no immediate threat to the investigating officers or anyone else.

Furthermore, it is hard to conceive of circumstances under which a reasonable officer could be more confident that evidence would *not* be destroyed or removed from the home while he sought a warrant. It is obvious that the dilapidated vehicles and piles of rotting lumber could not be quickly removed or destroyed, and the very act of doing so would merely have obviated the need to charge Simmonds with unlawfully accumulating such waste on his property. In fact, Officer Husband testified that his initial purpose in speaking with Simmonds was to inform him that he needed to remove these items from his property and that it was only after Simmonds refused to do so that a citation was issued. Thus, under the totality of the circumstances, an officer could not have reasonably believed that there were exigent circumstances justifying the warrantless entry and collection of evidence in Simmonds' back yard. Accordingly, any evidence obtained as a result of that search violated Simmonds' Fourth Amendment rights.

 When evidence is obtained as a result of an unconstitutional search, the exclusionary rule requires that the fruits of that search be excluded from evidence at trial. *See United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir. 2002). The goal in suppressing such illegally obtained evidence is to "deter unlawful police conduct" and "to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused." *Id.* (citations and quotation marks omitted). Because the officers in this case obtained the evidence at issue in violation of Simmonds' Fourth Amendment rights, that evidence should have been excluded from trial, and because it was not, Simmonds' conviction will be reversed, and a new trial ordered.[7]

---

[7] The dissent concludes that "[e]ven if the evidence of waste material that the Officers saw or photographed after they entered Appellant's property is discarded, excluded or suppressed, there remains sufficient evidence, which the Officers observed from the public roadway, to sustain a conviction on the criminal citation issued to Appellant." (Dissenting Op. at 10.) But "[w]e are not concerned here with whether there was sufficient evidence on which the [appellant] could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Fahy v. Connecticut*, 375 U.S. 85, 86-87, 84 S. Ct. 229, 230, 11 L. Ed. 2d 171 (1963). Though not raised by the People, the dissent seems to suggest that even if the Superior Court erred in admitting the evidence, the error was harmless in light of other evidence which was sufficient to sustain the conviction. While constitutional errors of this type do not always require reversal, in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967), the Supreme Court ruled that "before a federal constitutional

## IV. CONCLUSION

■ We conclude that the trial court erred in denying Simmonds' motion to suppress evidence obtained from the officers' warrantless entry into, and search of, his back yard. The back yard area in question was within the curtilage of Simmonds' home. Thus, even if the officers had probable cause to believe that violations existed within the back yard based on what they observed from outside the curtilage, without either Simmonds' consent or exigent circumstances, their entry into the back yard violated Simmonds' Fourth Amendment rights. For these reasons, the trial court erred in denying the motion to suppress, Simmonds' conviction will be reversed, and the matter will be remanded for a new trial.

SWAN, *J.*, dissenting. I dissent and would affirm the conviction in this case.

## I. FACTS AND PROCEDURAL HISTORY

On August 29, 2007, Virgin Islands Waste Management Authority's ("WMA") Peace Officer, Clarence Husband, III ("Officer Husband") and

---

error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." The burden is on the beneficiary of the error, in this case the People, to make this showing. *Id.*

Though the People have not made any showing, the admission of the photographs was not harmless beyond a reasonable doubt. Like the Supreme Court of Kentucky:

> We find truth in the old adage, "A picture is worth a thousand words" Trial attorneys demonstrate the value of photographs on a daily basis in the courtrooms of this [territory] and we have no doubt that photographs frequently communicate the testimony of a witness to the jury more fully and accurately than the words in the testimony do.

*Gorman v. Hunt*, 19 S.W.3d 662, 668 (Ky. 2000). The WMA officers, too, must have subscribed to this adage, stating that they "always take pictures of situations like that." (J.A. at 130.) Moreover, inasmuch as the officers obviously felt it was necessary to take the photographs from the back yard, as opposed to street or front yard from which they had a lawful vantage point, the back yard vantage point must have provided some additional benefit. Indeed, the back yard may have provided a better point of view to take the photographs and the closer proximity likely yielded photographs depicting the alleged violations in greater detail. Finally, it is clear that the photographs were used at trial to corroborate the officers' descriptions of the alleged violations, and the Superior Court plainly relied on the photographs, which it believed were lawfully obtained, in finding Simmonds guilty. For these reasons, we conclude that "the erroneous admission of this illegally obtained evidence was prejudicial to [appellant] and hence it cannot be called harmless error." *Fahy*, 375 U.S. at 91-92, 84 S. Ct. at 233.

Virgin Islands Police Department Abandoned Vehicle Task Force's ("VIPDATF") Officer, Emile Proctor, ("Officer Proctor") visited the property of Roi Simmonds ("Appellant"), at Parcel No. 11-5-15 Estate Frydendahl[1] on St. Thomas. The Officers' visit was prompted by reports purportedly from Appellant's neighbors that a large amount of waste material had been accumulating in the general vicinity in which Appellant's property is located.

From the public street contiguous to Appellant's property, the Officers observed an accumulation of waste material occupying Appellant's property. (*See* J.A. at 106, 137.) Officer Proctor and Officer Husband proceeded to enter Appellant's property. Finding Appellant on the property, the Officers approached him. A discussion ensued between Appellant and the Officers concerning the removal of the waste material on his property. Officer Husband spoke to Appellant in an attempt to amicably resolve the issue of accumulated waste material upon Appellant's property. Previously, the Officers were successful in amicably resolving a similar issue involving the removal of waste material from the adjacent property, which is owned by Appellant's brother. Essentially, upon the urging of the Officers, Appellant's brother voluntarily removed similar waste material from his property. Nonetheless, Appellant ordered the Officers to leave his property, while refusing to cooperate with them. Appellant informed the Officers that they were on private property and that they had no business on his property.

Importantly, the Officers did not enter Appellant's property to conduct a search of the exterior or interior of Appellant's residence, to conduct a search of the adjacent curtilage or to conduct a search of the carport. Rather, the Officers had observed from the public road, objects they contended were waste materials accumulating on Appellant's property, which were exposed to public view. Therefore, when the Officers entered Appellant's property, they had already witnessed the statutory violations

---

[1] The criminal citation issued to Appellant and the trial testimony both indicate that Appellant's property is located in Estate Frydendahl. (*See, e.g.*, J.A. at 68, 112.) The trial court's February 22, 2008 Judgment, however, indicates that Appellant's property is located in Estate Frydenhoj. (J.A. at 5.) Estate Frydendahl and Estate Frydenhoj are two separate estates located in different parts of St. Thomas. Because the Officer who issued the citation and the Officers who testified at trial would have direct knowledge of the location of Appellant's property, this dissenting opinion will follow the Officer's designation of Appellant's property as being located in Estate Frydendahl.

concerning accumulation of waste materials on Appellant's property. This contention is confirmed by the selected portions of the trial transcript enumerated in a later part of this opinion. Importantly, the Officers approached Appellant but not with the initial intention of issuing him a criminal citation. Specifically, they approached Appellant with the expectation, from their perspective, that Appellant was a law abiding citizen, and he would cooperate in eradicating a health hazard that existed on his property in violation of local laws. Instead, the Officers were greeted with hostility, acrimony and with specific instructions from Appellant, whereby he advised the Officers to "get off my property. I can do what I want with my property." (*See* J.A. at 108-10.)

Because of Appellant's recalcitrance, Officer Husband contacted a second WMA Officer, Jarmel Rubaine, ("Officer Rubaine") for assistance. The Officers proceeded to take photographs of refuse; junk, including rusted, inoperable vehicles; rotting wood; and a junked, inoperable tow truck on Appellant's property. Officer Husband issued Appellant a citation for violating title 19, section 1563(5) of the Virgin Islands Code, which states:

> No person shall —
>
> . . . .
>
> (5) cause, suffer, or permit the accumulation on premises under his management or control as owner, lessee, contractor or otherwise, of waste which because of its character or condition may invite the breeding or collection of flies, mosquitoes or rodents, or which may in any other manner prejudice the public health.

V.I. CODE ANN., tit. 19 § 1563(5). Title 19, section 1552(pp) of the Virgin Islands Code explicates that " '[w]aste' when unqualified, means solid waste and/or hazardous waste."

Subsection (hh) of section 1552 defines solid waste as:

> [A]ny trash, rubbish (combustible or non-combustible), garbage, refuse, offal, filth, bottles, glass, crockery, cans, cartons, scrap metal, *junked vehicles, appliances or hardware*, brush, waste soil, rock, concrete products, and construction materials, animal carcasses, sludge from a waste treatment plant or air pollution control facility, or any unsanitary or offensive material or discarded matter, or parts or portions thereof, or any industrial, commercial, mining, agricultural or

other waste which is not subject to point source discharge permits under section 402 of the Federal Waste Pollution Control Act or Title 12, section 185 of this Code.

19 V.I.C. § 1552(hh) (emphasis added).

After viewing the waste from the public road, Officers Husband and Proctor entered Appellant's property and conducted a further examination of the areas around and behind Appellant's home. At that moment, Officer Rubaine was called for his assistance by the other Officers. The Officers succeeded in taking photographs of the areas on Appellant's property in order to obtain and to preserve evidence in support of a criminal citation. The following is the undeniable testimony of Officer Husband, as reflected in the transcript of proceedings of January 2, 2008:

Q. *What did you observe first of all from the street regarding the defendant's property?*

A. *From the public street, I observed numerous abandoned vehicles, household appliances, junk wood, and the yard was in a terrible condition.*

Q. And then as you indicated, when you approached the property, did you enter? What if anything did you do concerning —

A. Okay, the property — his house is about 10 or 15 feet away from the gate that I entered. I entered a drive-in area, which was opened, there was no fence, no nothing, it was opened, so I just walked in and I begin to talk to Mr. Simmonds.

. . .

Q. So, when you went to the property, did you go there with the intent to fine the defendant?

A: No, our intent isn't really to fine. We educate the people and most of the time we help them by moving the cars out of the yard which people are happy that we mov[e] the junk and abandoned vehicles out of their property.

(Trial Tr., Jan. 2, 2008; J.A. at 106-7.) (emphasis added).

The pertinent question is whether before they entered Appellant's property, the Officers observed on Appellant's property, from the adjacent public road, violations of our territorial statutory laws, which violations are consistent with the crime in title 19, section 1563(5). The answer is unequivocally yes. The trial transcript continues:

Q. So you were there to just simply talk to him?

A. Yeah.

Q. What was his response to you?

A. His response was, why I am there, this is his property, he can do what he wants. If he wants. If he wants to keep his junk vehicles there, the abandoned household appliances, the junk wood, it's his property, and I was trying to explain to him it does not work like that.

Q. And what did he say in response to what you were saying, did he change?

A. He asked me to leave.

(*Id.* at 109.)

Officer Husband emphasized that initially he was not at Appellant's house to issue criminal citations or to investigate the conditions on Appellant's property. Instead, he was there to impart to Appellant general information about the Territory's waste material laws and to inform Appellant, in a non-confrontational manner, about the statutory violations existing on his property. The cross-examination of Officer Husband continues:

Q. Okay. So then, what did you do then after you presented him with the citation?

A. Well, before, I called another officer, we took some pictures of the property.

Q. Who was the other officer you called?

A. Officer Rubaine

Q. Okay.

A. And we took pictures of the property and, at that time, I still didn't want to write the citation. I was asking him, why couldn't he clean up, and he refused, he said it's his property and he refused to clean up, that's when I began to write the citation.

Q. So, what if any hazards did you find on the property?

A. Well, he had piles of wood, which rats and rodents. [sic] He had open vehicles . . . there for years collecting water which is breeding of the mosquitoes, and household appliances. He had a toilet outside.

(*Id.* at 109-110.) During vigorous cross-examination of Officer Husband by Appellant's counsel, the following colloquy ensued:

566

Q. Now, you didn't have a warrant on that day

A. No.

Q. And you testified that there were numerous complaints, but these complaints were with respect to the Frydendahl area; isn't that correct?

A. Yes, the whole strip, the whole area because his brother's property is adjacent to his, too, which had complaints.

Q. So, you did not get any specific complaint against Mr. Simmonds; isn't that correct?

A. No, the whole Frydendahl area[.]

(*Id.* at 112.)

Regarding Officer Husband's viewing of wood and rubbish, the following is illustrative:

Q: You did not receive a specific complaint on Mr. Roy Simmonds' property; isn't that correct?

A: Specifically on Mr. Simmonds; no.

Q: Thank you. Now, you also stated that you observed wood; isn't that correct?

A: Rotten wood, yes. Water soaked wood, yes.

Q: And isn't it true that this wood was actually located on Mr. Simmonds' carport, beneath his carport; isn't that correct?

A: No, no the pictures could indicate.

Q: Now, you didn't see a single rat on Mr. Simmonds' property; isn't that correct?

A: No, it was 12:00 in the afternoon.

Q: So, when you testified that rats, that was your conclusion?

A: Yes, rats breed in that area.

Q: Now, let me ask you this —

A: Now, did I dig through it; no.

(*Id.* at 113-14.) Officer Husband agreed that he went unto Simmonds' property because of the presence of abandoned vehicles:

Q. In fact, the only reason that you went on Mr. Simmonds' property is because you saw vehicles that you deemed to be abandoned vehicles; isn't that correct?

A. That's correct.

(*Id*. at 134.) This question from Appellant's counsel confirms that the Officers saw the junk vehicles on Appellant's property before they entered the property. Crucially, Officer Husband adamantly testified that he viewed the waste material on Appellant's property while standing on the public road.

> Q. *Officer Husband, the areas on the property where you were located, were they viewable from the street like some of the areas you —*
> A. *That's correct.*
>
> . . .
>
> Q. Well, these areas — were these areas in intimate areas, bedrooms, or you never stepped into one of his bedrooms?
> A. No.
> Q. You were outside at all times?
> A. Correct.
> Q. *And again, these areas were viewable from —*
> A. *From the public street.*
> Q. *— the public street? Okay, thank you no further questions.*
> THE COURT: *Officer, was the area in the rear of the home also viewable from the public street?*
> THE WITNESS:[2] *Yes, Sir.*

(*Id*. 134-135.) (emphasis added). Officer Husband reaffirmed his testimony upon further re-cross examination by Appellant's Counsel, and reiterated that the accumulation of waste could be seen from the public road. Therefore, having observed the waste material from that vantage point, the Officers could prove the allegations in the criminal citation by their testimonies alone without utilizing any evidence they gathered or obtained after entering Appellant's property.

The degree of effortlessness required to view Appellant's property from the public roadway was described in the cross-examination conducted by Appellant's counsel:

> Q. Now, isn't it correct that Mr. Simmonds' rear yard is actually the home which sits in the middle of the property; isn't that correct?

---

[2] The witnesses' responses were previously designated in the trial transcript by use of a capital letter "A." This juncture, however, is one of several where the transcript designates the witnesses' responses by use of "THE WITNESS."

A. That's correct.

Q. Now, to the left of the property, standing from the road, isn't it correct that there's a building off to the side of the property?

A. To the left of the building.

Q. Yeah off to the left —

A. The left of Mr. Simmonds' property is his brother's property.

Q. I'm sorry?

A. Mr. Simmonds house is located here (indicating), on the left side is his brother's property.

THE COURT: is the left side as you face the property? You could see his house from the street. His house is here, another home here, his brother['s] property is here.

Q. Okay. Let me ask you this.

A. And his brother was going to be cited, but he cleaned up his property.

Q. Well, that is not an issue in this case. My question to you is, isn't it correct that Mr. Simmonds' property is separate and apart from his brother's property?

A. It's separated by a broken down fence, yeah.

Q. Separate and apart. My questions are strictly relegated to Mr. Simmonds — Mr. Roi Simmonds' property, not his brother's property; do you understand that?

A. Yeah.

Q. Now, to the left of the home, isn't it correct that he has another building on the left side of his home a wooden building, a wooden structure; isn't that correct?

A. Not when I was there; that's incorrect.

Q. *So you are testifying that from the road you can see the rear of Mr. Simmonds' property?*

A. *Yes. If you step back from the road, you can see behind of Mr. Simmonds' house from the road.*

(J.A. at 135-137.) (emphasis added).

Officer Rubaine testified that the conditions in Simmonds' carport can also be viewed from the public street. (*See, e.g.,* J.A. at 147) ("There were violations in front of the property, I just didn't take any pictures."); (*see also* J.A. at 148-149).

569

THE COURT: I'm sorry, I misunderstood the officer. Did you say that there were violations on the front of the property —

A. From the portside.

Q. *When you say the port, you're talking about the carport?*

A. *Yes, there's an open carport.*

Q. So, basically, what you're saying is that you observed violations within the carport area, in the carport?

A. Yeah, from carport go straight back.

THE COURT: *Could you see any of those conditions from the area outside the fence before you entered the property?*

A. *If you could see the conditions from the carport?*

THE COURT: *Before you entered the property?*

A. *Yeah, you could see the conditions.*

(J.A. at 147.) (emphasis added).

Appellant was cited for accumulating waste material on his property, which would breed mosquitoes and other disease spreading pests, thus endangering the public health in violation of title 19, section 1563(5) of the Virgin Islands Code. The trial court convicted Appellant of violating the territory's solid waste laws. A timely appeal ensued.

## II. JURISDICTION

This Court's jurisdiction emanates from title 4, section 32(a) of the Virgin Islands Code. Title 4, section 32(a) grants the Supreme Court of the Virgin Islands jurisdiction over all appeals "arising from final judgments, final decrees or final orders of the Superior Court or as otherwise provided by law." 4 V.I.C. § 32(a); *see also Malone v. People*, Crim. No. 2008-042, 2010 V.I. Supreme LEXIS 6, *12 (VI. Jan. 26, 2010).

## III. STANDARD OF REVIEW

Trial courts possess broad discretion in their evidentiary rulings reviewed on appeal. *Sprint/United Mgmt Co. v. Mendelsohn*, 552 U.S. 379, 384, 128 S. Ct. 1140, 170 L. Ed. 2d 1 (2008). Consequently, evidentiary rulings are reviewed for abuse of discretion. *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 412 (3d Cir. 2002) (citing *General Elec. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)).

## IV. ISSUE RAISED

Whether Appellant's Fourth Amendment rights were violated when officers of the Virgin Islands Government observed on Appellant's property, from the contiguous public roadway, violations of the Virgin Islands solid waste laws, and consequently issued a criminal citation to Appellant.

## V. DISCUSSION

### APPELLANT'S FOURTH AMENDMENT RIGHTS WERE NOT VIOLATED WHEN THE OFFICERS WENT UNTO HIS PROPERTY AFTER OBSERVING THE ACCUMULATION OF WASTE ON APPELLANT'S PROPERTY FROM THE PUBLIC STREET.

My discussion has a two-prong approach. The first prong involves events that occurred before the Officers entered Appellant's property. The second prong, the alleged search, involves events that occurred after the Officers entered Appellant's property. One must be mindful of the two separate and distinct aspects of this case which encompass (1) the evidence the Officers saw from the public road and, (2) the events that transpired after the Officers entered Appellant's property without a warrant. Even if the evidence of waste material that the Officers saw or photographed after they entered Appellant's property is discarded, excluded or suppressed, there remains sufficient evidence, which the Officers observed from the public roadway, to sustain a conviction on the criminal citation issued to Appellant.

Although inartfully crafted, the handwritten portion of the criminal citation issued by Officer Husband reads as follows: "Cause suffer and permit the accumulation of waste on property such as junk vehicles[,] house hold [sic] appliances wooo [sic] because of character [sic] and condition may breed mosquitos [sic] and prejudice public health[.]" (J.A. at 68.) Indisputably, everything enumerated in the criminal citation issued to Appellant was observed by the Officers from the contiguous public road and before they entered Appellant's property to converse with him. Moreover, the Officers' observation of the accumulated waste on Appellant's property was the impetus for entering Appellant's property to converse with him about the waste material on his property.

The critical or pivotal fact of what the Officers observed on Appellant's property from the vantage point of the public road is being obfuscated by

the interjection of the Officers' subsequent entry upon Appellant's property without a search warrant and without Appellant's consent. However, a search warrant or Appellant's consent is not a relevant issue that I must address in order to affirm Appellant's conviction. The Officers had no need to enter Appellant's property or to conduct a search of Appellant's property in order to discover evidence to prove the allegations in the criminal citation because the Officers had already observed the violations of the territory's solid waste laws on Appellant's property from the contiguous public road. Therefore, there is no Fourth Amendment violation committed by the Officers when the criminal citation involved criminal violations the Officers observed from the public road. Moreover, Appellant has no privacy right or expectation of privacy in any object on his property, which he consciously, deliberately and directly exposes to public view from the adjacent public road.

"Visual observation is no 'search' at all[.]" *Kyllo v. U.S.*, 533 U.S. 27, 32, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001). In order to constitute a search, there must be an invasion of a person's reasonable expectation of privacy by government agents. *See id.* at 33 ("a Fourth Amendment search does not occur — even when the explicitly protected location of a house is concerned — unless the individual manifested a subjective expectation of privacy in the object of the challenged search, and society is willing to recognize that expectation as reasonable.") (emphasis in original) (internal quotation marks omitted); *see also Oliver v. United States*, 466 U.S. 170, 177-78, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). Jurisprudence of the Supreme Court of the United States reveals a two-part test to determine whether a person has a legitimate expectation of privacy. *Bond v. United States*, 529 U.S. 334, 338, 120 S. Ct. 1462, 146 L. Ed. 2d 365 (2000); *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). First, the person must have a subjective expectation of privacy. (*Id.*) Second, society must be prepared to recognize the expectation as objectively reasonable. (*Id.*) A subjective expectation of privacy is demonstrated by action taken to keep objects, activities, or statements private.

In this case, Appellant made absolutely no attempt to conceal the waste material on his property from the public view. Moreover, Appellant's attitude speaks eloquently as to his mindset and attitude about his property when he told the Officers that "I can do what I want with my property." Importantly, "what a person exposes to the public, even in his

own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351; *see also United States v. Hatfield*, 333 F.3d 1189, 1198 (10th Cir. 2003) (no legitimate expectation of privacy in backyard because officer could observe marijuana plants from vantage point, in pasture adjoining defendant's land); *United States v. Segura-Baltazar*, 448 F.3d 1281, 1288 (11th Cir. 2006) (no legitimate expectation of privacy in garbage located in area visible and accessible from street because it was sufficiently exposed to the public).

Prior to entering Appellant's property, the Officers had observed the statutory violations of the solid waste statute from the public road. Furthermore, before entering Appellant's property, the Officers had all the evidence they needed to sustain a conviction on the criminal citation they issued to Appellant. Therefore, the Officers had probable cause to issue the criminal citation to Appellant. When the Officers entered Appellant's property to converse with him, they saw additional waste and additional violations of law not visible from the public road. At that juncture, the Officers did not rely on a "search" to justify the issuance of the criminal citation because they had already seen evidence of statutory violations from the public road, which prompted them to issue the criminal citation. Additionally, while the Officers took photographs of the condition existing on Appellant's property, they seized neither Appellant, nor his personal property. Therefore, crucial to my position is that the Officers were authorized to issue a criminal citation to Appellant for his violation of the Territory's laws when the violation could be observed from the public domain or public road, and without the Officers entering Appellant's property.

Because Appellant contends that his Fourth Amendment rights were violated, the following is offered. Since 1837, the Supreme Court of the United States has recognized that state and local governments possess an inherent power to enact reasonable legislation for the health, safety, welfare, or morals of the public. *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. 420, 11 Pet. 420, 9 L.Ed. 773 (1837). Title 19, section 1563(5) of the Virgin Islands Code was specifically enacted to protect the health, safety and welfare of the public. This police power is permitted to exist even though the regulation may infringe upon individual rights. *State v. Rathbone*, 110 Mont. 225, 100 P.2d 86, 92 (1940); *see also State v. Penny*, 42 Mont. 118, 111 P. 727, 730 (1910); *see also Stupak-Thrall v. U.S.*, 89 F.3d 1269, 1292 (6th Cir. 1996).

Regulations that are formulated within the state's police power will be presumed reasonable absent a clear showing to the contrary. *See, e.g., Billings v. Skurdal,* 224 Mont. 84, 730 P.2d 371, 373 (1986). Because there is no challenge to the validity of the statute, I conclude that title 19, section 1563 of the Virgin Islands Code is a valid statute which was promulgated, pursuant to the police power of the Government of Virgin Islands.[3] The only issue is whether the Officers specially trained to enforce this statute violated the Appellant's Fourth Amendment Right under the Constitution of the United States when they issued a citation to Appellant.

Under the Fourth Amendment, "warrantless searches are presumptively unreasonable. . . ." *Horton v. California,* 496 U.S. 128, 133, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). To be valid a search must generally be based upon probable cause and a warrant. The Fourth Amendment protects citizens from unreasonable searches and seizures in those areas in which citizens possess a reasonable expectation of privacy. The defendant bears the burden of proving that he or she possesses a legitimate expectation of privacy in the place or object searched. *United States v. Yang,* 478 F.3d 832, 835 (7th Cir. 2007). Generally, a search or seizure is considered unreasonable when conducted without a valid warrant. To reiterate and to emphasize, a reasonable expectation of privacy has two elements: first, the defendant must actually have a subjective expectation of privacy under the circumstances, and second, the circumstances of this expectation must be such that society accepts them as reasonable. *See Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978) (Expectation of privacy "by definition means more than a subjective expectation of not being discovered."); *Katz,* 389 U.S. at 361 (Harlan, J., concurring); *United States v. Taborda,* 635 F.2d 131, 139 n. 10 (2d Cir. 1980) ("the reasonableness of an expectation of privacy [is] logically dependent principally . . . on the degree to which the locale is viewable by a member of the public without visual aids."); *United States v. Whaley,* 779 F.2d 585, 591 (11th Cir. 1985)

---

[3] Appellant acknowledged the validity of the statute, and in fact, concerned himself with whether Officer Husband had indeed been properly trained within the meaning of the statute. (*See* Trial Tr., January 2, 2008; J.A. at 115-116.) Officer Husband testified that he was sworn in as an environmental officer after being properly trained pursuant to statute and regulations. (*See id.* at 115.)

("Although this possibility was admittedly small for any given day, because the illegal activity occurred over a three-month period in the plain sight of any person on the canal or on the neighbor's property the likelihood of discovery was substantially increased.").

Because the situation in this case is synonymous with the rationale applicable to some aspects, and I underscore "some aspects," of the "plain view" exception to the warrant requirement, I borrow these aspects of the "plain view" rationale on the narrow issue of expectation of privacy. However, I use the term "plain sight" as an expansive term, more broad than "plain view," to mean property or objects that are left in an open area and of which all persons in the general vicinity are afforded an unobstructed view. The Supreme Court of the United States has explicitly stated that where "*an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy.*" *Horton*, 496 U.S. at 133 (1990) (citing *Arizona v. Hicks*, 480 U.S. 321, 325, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987); *Illinois v. Andreas*, 463 U.S. 765, 771, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983)) (emphasis added); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971).

The widespread acceptance of this common sense aspect of "plain sight" is apparent in the actions of courts that have long upheld the imposition of fines for violation of similar municipal ordinances based on evidence which, at least in part, took the form of observations made from public sidewalks and neighboring properties. *See, e.g., Foley v. Harris*, 223 Va. 20, 286 S.E.2d 186, 188 (1982) (the evidence considered by the court included testimony that the violations at issue were visible from, among other places, the roadway, a neighboring home and carport, neighboring backyards and the nearby cul-de-sac).

Importantly, Fourth Amendment protection is dependent "upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas*, 439 U.S. at 143 (citing *Katz*, 389 U.S. at 353). Significantly, the issue of a lack of 'expectation of privacy' has been extended to the open windows or transparent windows of vehicles that allow a person to view what is inside the vehicle, without conducting a search. The United States Court of Appeals for the Eighth Circuit ("Eighth Circuit") has declined to conclude that a police officer who observed incriminating objects through an open car door had conducted a search because " 'a person who parks a car —

which necessarily has transparent windows — on private property does not have a reasonable expectation of privacy in the visible interior of his car.' " *United States v. Bynum*, 508 F.3d 1134, 1137 (8th Cir. 2007) (*quoting United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995)). The Eighth Circuit further elucidated that "[n]either probable cause nor reasonable suspicion is necessary for an officer to look through a window (or open door) of a vehicle so long as he or she has a right to be in close proximity to the vehicle." *Id.* (citation omitted). Therefore, when objects of a crime that are in a private vehicle or on private property are not concealed from human viewing, there is no expectation of privacy. Likewise, I find that neither probable cause nor reasonable suspicion is necessary to discover waste material on private property that is situated under a carport, when the waste material can be viewed by any member of the public, including law enforcement officers, from the adjacent public road. The reason is that a person does not have a reasonable expectation of privacy in property that he or she exposes to the public. *See United States v. Segura-Baltazar*, 448 F.3d 1281, 1287 (11th Cir. 2006) (in determining the reasonableness of an expectation of privacy in garbage placed outside a residence, but on private property, courts must consider the extent to which the garbage is exposed to the public).

Accordingly, because Appellant had no legitimate expectation of privacy in the accumulated waste material or junk on his property, which can be observed from the public road, the Fourth Amendment was not implicated; therefore, Appellant cannot claim that his Fourth Amendment rights were violated. It is preposterous and outlandish for anyone to deliberately expose to public view any object or activity on his property contiguous to a public road and thereafter claims a privacy right in such object or activity that is exposed to the public. To contend that such circumstances are incongruous with an individual's rights protected under the Fourth Amendment is an understatement. The Fourth Amendment protects against unlawful searches and seizures. No search exists when law enforcement officers can simply view violations of law upon private property from the public road.

I emphatically underscore the Officers' observations from the public road. Based on the trial transcript, it is obvious that Officer Husband's and Officer Rubaine's observations from the contiguous public road resulted in their belief that they had witnessed Appellant violating a Virgin Islands statute. During cross-examination by Appellant's counsel, the Officers

never recanted or wavered in their testimony concerning what they observed from the public road, which were an "accumulation of waste[,]" which endangered the public health and which violated the Virgin Islands Code.

The testimony of Officer Husband, which is corroborated by the testimony of Officer Rubaine, is uncontroverted that the Officers could see the statutory violations on Appellant's property from the public road. In the record before us, there is no evidence to refute, disavow or contest the Officers' testimonies. Similarly, there is no offer of countervailing evidence that the Officers could not observe the criminal violations on Appellant's property from the public road. Neighbors had complained about the entire neighborhood concerning accumulation of waste material on several neighborhood properties, which occasioned the Officers presence in Frydendahl. The Officers viewed the violations on Appellant's property while investigating complaints about the general Frydendahl area. Nonetheless, Appellant argues that the Officers came to his home to investigate without a warrant. Apparently, Appellant believes that he had an expectation of privacy in his yard and carport, even though neither one was enclosed as to obstruct or to preclude, from a vantage point on the public road, viewing of the violating objects and waste material.

When the Officers initially entered Appellant's property, their objective was to converse with Appellant about the statutory violations they had already observed from the adjacent public road and not to conduct a search of his property or an investigation. This contention is true notwithstanding the fact that the Officers had already observed a sufficient accumulation of waste material on Appellant's property which allowed them to issue Appellant a citation.

I cannot ignore the trial testimony that violations of the territory's criminal statute, which were located under the carport, were observed from the public road. The fact that the Officers ventured unto Appellant's property to take photographs of what they had first observed under the carport does not negate the fact that the waste material under the carport was first observed from the public road adjacent to Appellant's property.

Because Appellant believes that he had an expectation of privacy in his yard, which the finder of fact described as "industrial[,]" I will also address that issue. To emphasize, it is beyond dispute that the Fourth Amendment protects only a person's reasonable expectation of privacy, not his subjective expectation of privacy. The Fourth Amendment does

not protect citizens' activities "out of doors in fields, except in the area immediately surrounding the home." *Oliver v. United States*, 466 U.S. 170, 178, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). The area immediately surrounding the home, the "curtilage," is considered to be an extension of the home; it is that area which "harbors those intimate activities associated with domestic life and the privacies of home." *United States v. Dunn*, 480 U.S. 294, 301 n. 4, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987). On the other hand, "open fields," which are regarded for Fourth Amendment purposes as tantamount to public places, include undeveloped or unoccupied areas outside of the curtilage, even if those areas are neither "open" nor "fields" as those terms are commonly understood. *Id.* at 304.

Curtilage is not defined by the property line. *Id.* at 301. The fact that the property is fenced, without more, does not determine a curtilage. *Id.* In *United States v. Dunn*, 480 U.S. 294, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987), the Supreme Court of the United States defined curtilage by the examination of four factors that reflect whether an individual may reasonably expect the area to be treated as an extension of the home. *Id.* at 301 n. 4. The four factors are: (1) the proximity of the area to the house, (2) whether the area is within an enclosure surrounding the house, (3) the use of the area, and (4) the steps taken to protect the area from observation by the public. *Id.* at 301.

Appellant argues that his carport was covered and that a fallen fence separated his property from his brother's property; therefore, he had a reasonable expectation of privacy in his carport. This argument is spurious and meritless because it ignores the fact that even though the carport may have had a roof, objects and items under the roof of the carport were visible from the public road. Appellant conveniently ignores the fact that the sides of the carport were open to viewing from the public road. Accordingly, Appellant had no expectation of privacy in the objects and items under the carport that could be seen from the public road.

Crucially, there is nothing in the record on appeal to dispute or refute that the Officers had an unobstructed view of the property from the road where the Officers observed junk, debris, and other waste material on Appellant's property in violation of our statutory laws. Moreover, no claim has been advanced by Appellant that the Officers had to remove or relocate any part of the fencing or any other barrier in order to observe from the public road the statutory violations on Appellant's property.

Appellant's right to privacy argument is undermined when a neighbor, even if the neighbor is Appellant's brother, can see what is located on his property through the broken fence. When a person's activities "could be viewed with the naked eye from a position . . . on neighboring property," the expectation of privacy is reduced to a vanishing point. *United States v. Whaley*, 779 F.2d 585, 590-92 (11th Cir. 1985). Apart from the abandoned vehicles that were in the open view of the public, it was undisputed that anyone on the neighbor's (Appellant's brother) side of the fence could see the accumulation of waste on Appellant's property.

Probable cause is required to issue a citation. The critical facts needed to establish probable cause emanated from the Officers' observations from the public road of junk vehicles on Appellant's yard. The Officers are empowered and authorized to make a determination and thereupon issue criminal citations whenever junked vehicles and other statutory solid waste violations are observable from the public road. Consequently, the determination to issue a citation could have been made before the Officers entered Appellant's property. Of course, after the Officers entered Appellant's property, they came upon more evidence to sustain a violation, but the additional evidence was cumulative to the evidence they previously observed from the public road. Therefore, the Officers did not need the photographic evidence they gathered after entering unto Appellant's property, in order to sustain the charge in the criminal citation. Likewise, the conviction on the criminal citation issued to Appellant need not be reversed merely because the Officers gathered photographic evidence while on Appellant's property. Probable cause to issue the citation, and sufficient evidence to sustain the charges alleged therein would still exist even if the photographic evidence had been excluded at trial. Furthermore, as long as the trial court, as the finder of fact, found the Officers' testimonies to be credible, concerning the statutory violations of waste material the Officers observed from the public road, the elements of the crime enumerated in the criminal citation issued to Appellant had been proven. Moreover, I find no level of a Fourth Amendment violation to justify suppressing the evidence the Officers observed from the public road, which is the same evidence the trial court used to convict Appellant. Therefore, I would affirm Appellant's conviction.

## VI. CONCLUSION

For the above reasons, I would affirm Appellant's conviction and affirm the judgment of the Superior Court of the Virgin Islands on the criminal citation issued to Appellant.