**DANIEL CARLO CASTILLO, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Crim. No. 2008-0072

Supreme Court of the Virgin Islands

July 2, 2013

241

DOUGLAS BEACH., ESQ., Kansas City, MO, *Attorney for Appellant.*

BERNARD M. VANSLUYTMAN, ESQ., Solicitor General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.* HODGE, *Chief Justice*, concurring.

## OPINION OF THE COURT

(July 2, 2013)

SWAN, *Associate Justice.* Appellant, Daniel Carlo Castillo, seeks reversal of his voluntary manslaughter conviction in the killing of a twelve-year-old minor. Castillo raises several issues for appellate review, alleging that the trial court violated his constitutional rights under the Fourth, Fifth and Sixth Amendments to the United States Constitution. Castillo further contends that the evidence was insufficient to sustain his convictions. For the reasons elucidated below, we affirm Castillo's convictions and the Judgment of the Superior Court. However, we remand the case to the trial court for the limited purpose of re-sentencing in compliance with title 14, section 104 of the Virgin Islands Code.

## I. FACTS AND PROCEDURAL HISTORY

This case began on April 6, 2007, when Beatrice Hennis informed the police that her twelve-year old-daughter, L.H., was missing. (J.A. Vol. I at 38.) Hennis had sent L.H. and her younger sister to stay with their aunt in Oswald Harris Court Housing Community ("Housing") on April 5, 2007. (Id. at 121.) On the morning of April 6, 2007, L.H. and her sister, using their aunt's telephone, informed their mother that they were going outside to ride bikes. (J.A. Vol. I at 122.) At approximately 4:00 p.m. that afternoon, the younger sister called the mother and informed her that L.H. went down the avenue of Estate Thomas with a man known to them as "Chi-Chi". (J.A. Vol. I at 123.)

Later that evening, the younger sister returned home without L.H. (J.A. Vol. I at 125.) After learning that L.H. had not returned to the aunt's house, Hennis began searching the Housing neighborhood where L.H. was visiting with her aunt, as well as the Bovoni Housing Community, which was L.H.'s permanent residence. (J.A. Vol. I. at 125-26.) Later that night, Hennis contacted both the police and her cousin, Detective John Farrington. (J.A. Vol. I at 127.) Thereafter, Officer Battiste, Detective

Farrington, Detective Farrington's wife and Hennis commenced a search for L.H. in the Estate Thomas neighborhood.

Detective Farrington interrupted his search at approximately 4:00 a.m. on April 7, 2007, and resumed about 7:30 a.m. This interruption allowed Detective Farrington, with the assistance of Hennis, to procure fliers with a photograph of L.H. The fliers were distributed in the Estate Thomas and Lockhart Gardens areas which are located in proximity to the Housing community. (J.A. Vol. I at 130.) Eyewitnesses said that they saw L.H. walking in the Housing area and the area of Eighth Street in Estate Thomas near an abandoned house with a light-skinned, black male known as "Chi-Chi," who was later identified as Daniel Castillo. (J.A. Vol. I at 39.) The "abandoned house" that they referenced is located at Lot 18 Estate Thomas on Eighth Street, which is within walking distance from the Housing community. (J.A. Vol. II at 164.) This property has an abandoned multi-structured house known to be frequented by vagrants and the homeless and has a wooden shed in the yard area. (*Id.*) Castillo resided in this house before and on or about April 6, 2007 through April 11, 2007.

Later that evening, Detective Farrington enlisted the assistance of other police officers, and they commenced a search of the abandoned building on Eighth Street that was identified as Castillo's last place of residence. When they arrived, the officers announced their presence and continued to search the premises while Detective Farrington was calling L.H.'s name with hopes that she would respond to a familiar voice. The officers encountered debris, feces, and other unwelcoming substances in the house, but they were unable to locate L.H. (J.A. Vol. IV at 8-9.) Thereafter, the police authorities procured a flier with Castillo's photograph which informed the public that he was wanted by police for questioning.

The local police authorities then solicited assistance in the investigation from the U.S. Marshals Service, whose members also searched the abandoned house for L.H. but to no avail. On April 8, 2007, the marshals continued their search for Castillo, including proceeding to the Frenchtown area in an attempt to locate him. Subsequently, the marshals made contact with Castillo in front of the Frenchtown Deli, a business establishment. (J.A. Vol. IV at 46.) The marshals identified themselves to Castillo and told him that one of the police sergeants wanted to talk with him. (*Id.*) Castillo said that he was aware the police

were searching for him and that he was attempting to procure $2.00 for cab fare to go downtown ostensibly to the police station. (*Id.*) Without *Mirandizing* or making the standard arrest of Castillo, the marshals immediately offered Castillo a ride to the police station which he accepted.

During the ride, the marshals told Castillo that they were looking for a missing girl that was last seen on April 6, 2007 at about 2:00 p.m. The marshals then stopped and treated Castillo to a meal at the McDonalds Restaurant in the Frenchtown area. After Castillo ate, the marshals escorted him to the police station where the police asked Castillo a series of questions. Castillo answered the questions, indicating that he did not know the whereabouts of L.H. at the time she was considered to be missing. The officers immediately released Castillo from their custody.

On April 11, 2007, law enforcement authorities were informed that there was a strong odor emanating from the abandoned premises on Eighth Street, Estate Thomas. Upon arriving at the location, the police discovered L.H.'s decomposing body in a garbage bin in proximity to the abandoned house on Eighth Street where Castillo had recently resided. On April 12, 2007, three marshals returned to the Frenchtown area and resumed searching for Castillo. The marshals decided to search a hill in the area near the Villa Olga Restaurant. Subsequently, one of the marshals saw Castillo standing on a rock near an erected blue tarpaulin. (J.A. Vol. IV 50.) Unsure of the terrain on the other side of Castillo, and unsure as to whether Castillo was a flight risk, the marshal unholstered his gun and said "U.S. Marshal. Freeze." (J.A. Vol. IV at 52.) Castillo complied with the command by raising his hands in the air. (*Id.*) The marshal then instructed Castillo to get off the rock upon which he was standing and to lie face down on the ground. (*Id.*) Again, Castillo complied. (J.A. Vol. IV. at 52.)

One of the other marshals simultaneously approached the scene. (*Id.*) While one marshal was frisking Castillo for weapons, Castillo voluntarily confessed to killing L.H. (*Id.*) The marshal immediately arrested Castillo and read him his *Miranda* rights from a card that was in the marshal's pocket. (J.A. Vol. IV. at 53.) The marshal asked Castillo several times if he understood his rights, and Castillo responded yes. Castillo continued to divulge to the marshals the events that resulted in L.H.'s death. (J.A. Vol. IV. 59-60). (J.A. Vol. IV. at 61.) A marshal asked Castillo if he wanted an attorney and Castillo said no. (*Id.*) The marshals collected Castillo's

belongings and escorted him down the hill to their vehicles. (*Id.*) While they were walking down the hill, Castillo told the marshals that he was hungry and thirsty. (J.A. Vol. IV at 62.) The marshals stopped at a nearby McDonalds Restaurant and bought Castillo a meal. (*Id.*) The marshals then proceeded to memorialize the statements Castillo made to them while they were on the hill. (*Id.*) Both the marshals and Castillo signed this statement. (J.A. Vol. I. at 210.)

At the police station, Castillo signed a waiver of rights form and gave a statement to the police. (J.A. Vol. I. at 273.) The confession is as follows:

> On Friday April 6th, 2007, I got up early. This was my birthday so I went to Oswald Harris Court where I stayed and waited for my cousin to bring me some money. While I was there in the Housing, I was drinking beers. When my cousin came and gave me the money which was $20, I went and buy a bag of weed with it. I then started to smoke some of the weed and I bought two more elephant beer to drink. I then saw [L.H.] in the area of Building 5 of Harris Court coming walking. I told her to come to get her uncle stuff from my place on Eighth Street because somebody is always . . . breaking into the place all the time and taking his stuff.
>
> I then walked with [L.H.] from Building 5 down the avenue. We then turn up on to Eighth Street to go by my place where I does stay. When I got by my place, we went inside my place and I started to pack her uncle stuff.
>
> While packing her uncle stuff I started to tell her that her mother is a bitch because she does not take care of them and how she got my baby mother to stop bringing my children to see me
>
> So it look like I had trigger something and she slap me in the back of my head. Then she slapped me again on the bump behind my left ear so I then turned around and grabbed her, pushing her against wall. She then hit her head against the wall and then I choke her and continue choking her until she stop breathing. She was not fighting back or anything. She just stayed there holding her breath. I was so pump up that I couldn't believe what I did. I had a tub in my room so I took out the clothes and put her in there. Then I just burst off. I put her in the shed,

then I took off. I didn't sleep there the Friday night. I then been on the road. I stop sleeping there and was sleeping on the street. I wanted to kill myself because I couldn't deal with what had happened.

Castillo signed and dated the statement. (J.A. Vol. I at 284-86.)

Castillo was charged in a three-count Information with one count of First Degree Murder in violation of 14 V.I.C. §§ 921, 922; one count of Second Degree Murder in violation of 14 V.I.C. §§ 921, 922(b); and one count of Aggravated Child Abuse in violation of 14 V.I.C. § 506(3). (J.A. Vol. I, at 36-37.) Castillo's counsel filed a Motion to Suppress, seeking to suppress Castillo's April 8, 2007 and April 12, 2007 statements to law enforcement officers. Hearings were held on the Motion to Suppress on August 21, 2007, September 14, 2007, and October 2, 2007. On February 5, 2008, the trial court granted the Defense's motion to suppress Castillo's April 8, 2007 statements but denied the defense's Motion to Suppress Castillo's April 12, 2007 statements. Additionally, the trial court ruled inadmissible the evidence concerning whether L.H. was wearing panties at the time her decomposed body was discovered.

A jury trial commenced on June 10, 2008. Over the defense's objections, the trial court allowed the admission in evidence of L.H.'s underwear, which was recovered at the crime scene separate from on L.H.'s person, for a limited purpose and under the apparent premise that the underwear was impeachment evidence. At the conclusion of all the evidence, the defense made a Federal Rule of Criminal Procedure Rule 29 Motion, asserting that the People had failed to meet its burden of proof on all of the counts in the Information. The trial court granted the defense's Rule 29 Motion only as to Count I and denied the motion as to the remaining counts. The Information was amended to reflect the ruling that Count I was dismissed. On June 13, 2008, the jury found Castillo guilty of voluntary manslaughter, a lesser included offense of first degree murder, and guilty of aggravated child abuse. Castillo was sentenced to life imprisonment. This timely appeal ensued.

## II. JURISDICTION

Title 4, section 32(a) of the Virgin Islands Code states that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." A final order is a judgment from a court

253

which ends the litigation on the merits, leaving nothing else for the court to do except execute the judgment. *Ramirez v. People*, 56 V.I. 409, 416 (V.I. 2012) (citing *In re Truong*, 513 F.3d 91, 94 (3d Cir. 2008); *Bethel v. McAllister Bros., Inc.*, 81 F.3d 376, 381 (3d Cir. 1996)). The Superior Court entered a final judgment in this matter on September 9, 2008. Therefore, we have jurisdiction over Castillo's appeal.

## III. ISSUES

Castillo propounds seven issues on appeal:

a. Whether the admission of Castillo's statements given to law enforcement officials on April 12, 2007 and the admission of evidence regarding the discovery of L.H.'s body violated Castillo's constitutional rights under the Fourth, Fifth, and Sixth Amendments;

b. Whether Castillo was subjected to multiple prosecution and punishment for the same unlawful acts or offenses in violation of Virgin Islands law and the double jeopardy clause of the Fifth Amendment of the United States Constitution;

c. Whether the trial court abused its discretion in applying the Habitual Criminals Statute and whether the same statute is unconstitutional;

d. Whether the trial court erred in declining to give the jury a final instruction on intoxication of a defendant;

e. Whether there was sufficient evidence to sustain Castillo's convictions;

f. Whether the trial court erred by admitting in evidence L.H.'s underwear; and

g. Whether Castillo has a legitimate claim of ineffective assistance of counsel.

## IV. STANDARD OF REVIEW

The standard of review for examining the Superior Court's application of law is plenary, while factual findings are reviewed for clear error. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007). We generally review trial court decisions concerning the admission and exclusion of evidence for abuse of discretion. *Billu v. People*, 57 V.I. 455, 461 (V.I. 2012). However, when a ruling on the admission of evidence implicates the interpretation of a legal standard, our review is plenary. *Id.*; *see also Corriette v. Morales*, 50 V.I. 202, 205 (V.I. 2008).

## V. DISCUSSION

### A. The admission of Castillo's statements to law enforcement officials on April 12, 2007, and the evidence of the discovery of L.H.'s body in the abandoned property on Eighth Street, Estate Thomas did not violate Castillo's constitutional rights under the Fourth, Fifth, and Sixth Amendments.

Castillo argues that the trial court erred when it failed to suppress his April 12, 2007 statements to the U.S. Marshals, in which he admitted killing L.H., and that the trial court further erred when it failed to suppress evidence regarding the discovery of L.H.'s body on the Eighth Street property because this evidence was obtained in violation of his Fourth[1], Fifth, and Sixth Amendment Rights.

Castillo's argument is two-fold. First, Castillo argues that his statements and the information regarding the discovery of L.H.'s body were obtained in violation of his Fourth Amendment rights because the information used to obtain this evidence emanated from an unlawful arrest, and the evidence regarding the discovery of L.H.'s body was obtained without a search warrant supported by probable cause. Second, Castillo argues that in violation of his Fifth Amendment rights, he was not timely and properly *Mirandized* when he was apprehended on April 12. We will address each of Castillo's arguments in seriatim.

#### 1. Neither Castillo's April 12, 2007 statement, which was admitted in evidence, nor the discovery of L.H.'s body violated Castillo's Fourth Amendment right.

 Castillo asserts that because he was initially arrested on April 8, 2007 without probable cause and without being administered *Miranda* warnings, in violation of the Fourth and Fifth Amendments, all subsequent evidence obtained by law enforcement officials should have been excluded under the "fruit of the poisonous tree" doctrine. "When evidence is obtained as a result of an unconstitutional search, the exclusionary rule requires that the fruits of that search be excluded from

---

[1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. Amend. IV.

255

evidence at trial." *Simmonds v. People*, 53 V.I. 549, 561 (V.I. 2010) (citing *United States v Zimmerman*, 277 F.3d 426, 436 (3d Cir. 2002); *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)). "[T]he Supreme Court made clear that in determining the 'fruit of the poisonous tree' question, we ask 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *United States v. Perez*, 506 Fed. Appx. 672, 674 (9th Cir. 2013) (unreported) (quoting *Wong Sun*, 371 U.S. at 488). The policies underlying the exclusionary rule do not draw a distinction between physical and verbal evidence. *United States v. Ceccolini*, 435 U.S. 268, 275, 98 S. Ct. 1054, 55 L. Ed. 2d 268 (1978); *United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011) ("The exclusionary rule applies both to direct products of an illegal search — i.e., the physical evidence found during the search itself — and to indirect products of the illegal search — i.e., statements or physical evidence subsequently obtained in part as a result of the search . . . .") Consequently, "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Wong Sun*, 371 U.S. at 485 (citing *Nueslein v. District of Columbia*, 115 F.2d 690 (D.C. Cir. 1940)).

▮ However, the United States Supreme Court has opined that the exclusionary rule has no application where the verbal or tangible evidence was obtained from an "independent source" or where the "connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint." *Id.* at 487 (internal quotation marks and citation omitted); *see United States v. Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012). Accordingly, the High Court held that in finding that evidence is the "fruit of the poisonous tree," it is insufficient to simply say that the evidence would not have come to light except for the illegal action of the police, but rather whether the evidence was obtained by subsequently exploiting the primary illegality. *Wong Sun*, 371 U.S. at 488.

▮ Castillo argues that the case applicable to his circumstance is *Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975). In so arguing, Castillo asserts that the trial court did not properly apply the factors established by *Brown*, and he contends that, consequently, the trial

court arrived at the erroneous conclusion that the statements he made to law enforcement officials on April 12, 2007 were not connected to the unlawful arrest or to the statements made to law enforcement officials on April 8, 2007. Therefore, he contends, the trial court erred in ruling that the statements were admissible at trial. We conclude, however, that Castillo's argument adopts a misplaced and misguided application of the factors established by the *Brown* case. In *Brown*, the United States Supreme Court extended the holding in *Wong Sun* and sought to strike a balance between the Fourth and Fifth Amendments regarding suspects' statements made to law enforcement officers. Although a suspect's Fifth Amendment right can be waived if a voluntary statement is given, such statement may nevertheless be inadmissible if procured through a violation of the Fourth Amendment. The facts in the *Brown* case are pertinent in understanding the justification behind the Court's holding and will be mentioned briefly here. In that case, law enforcement officials went to Brown's apartment building, searched his apartment, and when Brown subsequently arrived at his apartment, the officers arrested him without a warrant and without probable cause. The officers then transported Brown to the police station and after placing him in the interrogation room, advised Brown of his *Miranda* rights. 422 U.S. at 593-94.

The state Supreme Court in *Brown* found that there was no probable cause for Brown's arrest, but upheld the trial court's decision not to suppress the evidence based on the theory that "the giving of the *Miranda* warnings [after the unlawful arrest], in the first instance by the police officer and in the second by the assistant State's Attorney, served to break the causal connection between the illegal arrest and the giving of the statements, and that the defendant's act of making the statements was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Id.* at 597 (internal quotation marks omitted). Essentially, in *Brown*, the lower court held that if an arrest was made in violation of the Fourth Amendment, once *Miranda* warnings are given in accordance with the Fifth Amendment before a confession is made, a confession obtained thereafter is admissible at trial because such confession is no longer the "fruit" of the illegal arrest. However, on appeal, the United States Supreme Court rejected the Illinois state court's rationale and explicated that the mere giving of *Miranda* warnings was not sufficient to curb the illegality of the search and seizure. The Supreme Court held that a

257

confession obtained after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession can be regarded as "sufficiently an act of free will to purge the primary taint." *Brown*, 422 U.S. at 601-04.

In *Brown*, the Supreme Court elucidated that in determining whether a confession was "sufficiently an act of free will to purge the primary taint," *id.* at 602 (internal quotations marks and citation omitted), it is important to examine the specific facts of each case because each situation can be very diverse and complex. The Court reasoned that, although *Miranda* warnings are important in instances of confessions, they are not the only factors to consider. Essentially, *Brown* established other factors to consider when determining if the subsequent confession obtained after an illegal arrest was sufficiently an act of free will to purge the primary taint. These factors include: (1) the presence of intervening circumstances; (2) the voluntariness of the statement; (3) the temporal proximity of the arrest and confession; and (4) the purpose and flagrancy of the official misconduct. *Id.* at 603-04. It is noteworthy that the factors in *Brown* were analyzed based on the confession that was obtained after the illegal arrest, which occurred immediately prior to the confession.

The facts in this case are immeasurably different from the facts in *Brown*. Here, we are confronted with two separate arrests — one which occurred on April 8, 2007, and another which occurred on April 12, 2007. Castillo argues that under the *Brown* factors, the illegal arrest of April 8 prohibits the People from using the statements obtained from him on April 12. The Court must first review Castillo's statement taken on April 8, which resulted from an unlawful arrest under the Fourth Amendment, according to the principles established in *Wong Sun*. The review will determine if the *Brown* factors need to be applied in order to make a determination on the admissibility of the April 12 statement. Accordingly, we must first examine the activities of April 8 and determine if there is any linkage between the April 8 and April 12 arrests.

Castillo was apprehended on April 8, 2007, by U.S. Marshals near the Frenchtown Deli establishment. The marshals transported Castillo to the police station where he was questioned ostensibly without any indication of *Miranda* warnings ever been administered to him. The defense moved to suppress Castillo's statement to police officers on April 8. In a Memorandum Opinion, the trial court granted Castillo's Motion to Suppress his April 8, 2007 statements to law enforcement officers, after

finding that the arrest and subsequent interrogation were in violation of the Fourth and Fifth Amendments of the United States Constitution. Castillo thereafter filed another motion to suppress the statements he made to law enforcement officials on April 12th and to suppress evidence relating to the discovery of L.H.'s body, arguing that all of that evidence was obtained through exploitation of an unlawful arrest and Castillo's April 8 inadmissible statement.

■ Despite Castillo's contentions, we conclude that the April 12 confession and the information regarding the location of L.H.'s body were obtained from an "independent source" or that the connection between the April 8 illegal conduct of the police and the discovery of the challenged evidence had become so attenuated as to dissipate the taint and therefore it did not fall under the exclusionary rule. Castillo's interrogation and statements to the law enforcement officers on April 8, 2007, are as follows:

Q: So do you know [L.H]?
A: Yes.

Q: When was the last time you saw [L.H.]?
A: On my birthday April 6th around 2:30 p.m.

Q: Were you walking with [L.H.]?
A: No.

Q: Were you with [L.H.]?
A: No.

Q: Did [L.H.] speak to you?
A: I told her hello, and asked her how she was doing.

Q: Did [L.H.] tell you where she was going?
A: No.

Q: What did [L.H.] have on that day that you saw her?
A: She had on a pink dress (fitted long).

Q: In what area did you see [L.H.]?
A: I saw her between Building 5 and 2 in Oswald Harris Court. She was talking to her sister who was on a bike telling her she was going to

259

K-Mart to buy a straight. Her little sister told her "you don't have no money to buy a straight." [L.H.] told her "Don't mind my business." I saw her going towards K-Mart and I sat where I was and a couple of minutes after she came back with a K-Mart bag with straight. She went to Building 5 archway and she went and put the straight on the porch and went about her business.

Q: Did you see where she went after she put the straight on the porch?
A: Yeah she went walking down by Building 2 side.

Q: Did you see [L.H.] get into a vehicle?
A: No.

Q: Was she with anyone?
A: I did not see her with nobody. It looked like she was trying to do some stuff before her grandmother came to pick her up.

Q: Have you seen [L.H.] since April 6th?
A: No, I haven't seen her.

Q: Do you know where she could be?
A: I have no idea.

Q: Do you know if [L.H.] has a boyfriend?
A: I know she has a friend (a man name Scabby nephew) his name is Aniek that is who she does be around a lot.

Q: How long have you known [L.H.]?
A: I know her from 1997 or 1998 that's when they use to stay with my baby mother. Her mother (Anita) was my baby mother's roommate.

Q: What is your baby mother name?
A: Kamisha Hodge.

Q: Where does Kamisha live?
A: Some place out Bolongo. I don't know the exact location.

Q: How old is Aniek?
A: I don't know he goes to Cancryn.

Q: Has any of the family members ever told you [L.H] run away from home before?
A: No.

Q: What kind of relationship does [L.H.] have with her mother?
A: A typical mother daughter thing . . . .

Q: Have you ever seen [L.H.] mother beat her?
A: She would beat her to discipline her not to abuse her . . . .

Q: Do you know where [L.H.] does hang out?
A: No.

Q: Do you know any of [L.H.] friends?
A: Yes, one girl who make birthday the same day as me her name is Dinisha, Jalisha and Fefe.

Q: Where does [(sic)] these girls live?
A: Danisha lives Building 6 of Oswald Harris, Jalisha lives Building 5 of Oswald Harris Court, Fefe lives on Second Street across from a coconut tree. It is not far from where the other two girls live. I don't know the building number.

Q: Do you have anything else add to this statement?
A: No.

Q: Can you read, write and understand English?
A: Yes.

(J.A. Vol. IV. at 11-13.) After the interrogation concluded Castillo was released. Castillo's statement is devoid of any information remotely disclosing where L.H.'s body was discovered or information which led to his subsequent arrest on April 12, 2007. On April 8, Castillo stated that he did not know the whereabouts of L.H; therefore, he was released from custody. The investigation continued, and there is no indication in the trial record that Castillo was subsequently apprehended, interrogated, or otherwise contacted by law enforcement authorities until April 12, 2007.

The information law enforcement officials received concerning L.H.'s death was not derived from nor connected to Castillo's April 8, 2007

statement to police. Rather, eyewitnesses told law enforcement officials that L.H. had been seen walking with Castillo in the vicinity of Housing and Eighth Street in Estate Thomas. Additionally, information from members of the community assisted police officers in locating L.H.'s body in the house identified as Castillo's residence. L.H.'s body was found because neighbors of the Eighth Street property experienced a strong odor emanating from where Castillo was known to reside and alerted the police. The officers procured a search warrant for the Eighth Street property, and after they conducted an extensive search of the premises, they found L.H.'s body and also found several items with Castillo's name on them. Having acquired probable cause for his arrest, law enforcement officials commenced a second search for Castillo.

■ On April 12, 2007, law enforcement officers resumed the search for Castillo in the Frenchtown area. When he was apprehended a second time, and while law enforcement officers were patting him down for weapons, Castillo voluntarily confessed to killing L.H. without any questions posed to him by the law enforcement officers or prompted by those officers. The officers immediately arrested Castillo. This second arrest was not connected to Castillo's interrogation or custodial activities which transpired during the April 8, 2007 arrest and ensuing interrogation, the evidence from which was suppressed. The arrest of Castillo on April 12, 2007 was an independent act which ensued from information obtained separately from anything that transpired during the April 8, 2007 questioning of Castillo. Having concluded that the April 12, 2007 arrest was lawful, the *Brown* factors are inapplicable to Castillo's statements that followed thereafter. As previously stated, the only statements that were connected to the officer's unlawful conduct on April 8, 2007, were the answers that Castillo gave concerning questions posed to him on April 8, 2007, and those statements were suppressed by the trial court. Importantly, it must be underscored that the statements Castillo made on April 12, 2007, were not connected to his April 8, 2007 statements and were made after a lawful arrest supported by probable cause. The factors established in *Brown* are only necessary in instances where statements are made following a Fourth Amendment violation. It is unnecessary for us to determine whether the subsequent *Miranda* warnings interrupted the connection because we have already determined there was no connection.

■ Castillo challenges all of the statements that he made on April 12, 2007, the last of which was a third statement made to the police after

being transferred to custody of the VIPD from the marshals. Before he gave this statement, he signed two documents, the Warning as to Rights document and a waiver of his right to remain silent. (J.A. Vol. I. at 274.) "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *N. Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979). Further, the issue regarding waiver of one's right to remain silent is "whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Id*. A waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (citing *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)). The record shows that Castillo knowingly and voluntarily waived his rights. At trial Officer Bess testified:

> Q. And prior to taking his statement, what if anything, did you state to him or inquire from him?
>
> A. . . . . Prior to him signing the waiver, he was about to sign the waiver and I stopped him and I indicated to him that if he is going to sign this waiver that means he is willing to tell me what happened to L.H. in regard to her death. He indicate to me that this is why he is here and its been bothering him and he needs to get it off his chest.
>
> Q. Did you inquire as to whether or not the Defendant, Mr. Castillo, could read?
>
> A. Yes.
>
> Q. How did you did that, Sir?
>
> A. Prior to me reading the waiver to him I asked him to read the first line on it for me. He read the first line which indicated to me that he can read.

(J.A. Vol. I. at 276).

There are no grounds to challenge Castillo's waiver of his right to remain silent. There is no evidence that his statement was coerced by the police. Further, Castillo had made a statement previously with the same

information included. Castillo divulged nothing to law enforcement officials on April 8, 2007, that offered any clues or indication of where L.H's body was located. When persons living in proximity to the house where Castillo had resided reported to the police that a malodorous odor was emanating from the immediate area near the house, the police immediately proceeded to investigate the odor and found L.H.'s body partly decomposed. Therefore, the trial court's decisions to deny Castillo's motion to suppress his April 12, 2007 statement and to suppress information on the discovery of L.H.'s body were not error.

### 2. Castillo's Fifth Amendment rights were not violated.

Castillo also argues that he was denied his rights under the Fifth Amendment because he was not properly *Mirandized*. The Fifth Amendment provides that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The Fifth Amendment privilege against self-incrimination allows a person to refuse to testify at trial, and to refuse to provide evidence that would lead to prosecution or be used against a person in a criminal prosecution. *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984). Therefore, the Fifth Amendment essentially protects a person in custody from being coerced into making statements to law enforcement officials that could possibly result in self-incrimination.

In *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the United States Supreme Court recognized the danger of self-incrimination inherent in custodial interrogations by law enforcement officers and stated the following:

> [W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

Specifically, *Miranda* requires that when a suspect is in custody by law enforcement officers and, before being questioned, the suspect must be in-

formed that he or she has certain rights, including the right to remain silent and the right to the presence of an attorney. *Id.* at 444. Such measures are only required when "there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)).

▮ A defendant's statement to police in violation of *Miranda* is admissible for use in impeaching the defendant's credibility but not as part of the government's case-in-chief. *United States v. Stevens*, 935 F.2d 1380, 1396 (3d Cir. 1991) (citing *Harris v. New York*, 401 U.S. 222, 225-26, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971)). Statements made, however, when a suspect is not in custody are admissible because under such circumstances *Miranda* warnings are not required. *Alston v. Redman*, 34 F.3d 1237, 1246-47 (3d Cir. 1994) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S. Ct. 1682, 64 L. Ed. 2d 297, (1980)). A suspect can waive his rights by choosing to give a statement after the required warnings have been given. *Miranda*, 384 U.S. at 444.

▮ Castillo argues that the marshal "again intentionally failed to timely and properly *Mirandize* him when he was initially apprehended on April 12 for questioning." (Appellant's Br. 12.) Inquiries, statements or conduct by police officers which in light of the suspect's character are reasonably calculated to elicit from a suspect an incriminating response constitute an interrogation for purposes of the *Miranda* rule. *Pennsylvania v. Muniz*, 496 U.S. 582, 600-01, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990); *Innis*, 446 U.S. at 301. However, this rule is not violated if a suspect chooses to voluntarily make statements to the police. *See Edwards v. Arizona*, 451 U.S. 477, 485-86, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) (citing *Innis*). Moreover, the requirement to administer *Miranda* warnings does not apply to volunteered statements to the police, *id.*, or spontaneous statements. *United States v. McCoy*, 200 F.3d 582 (8th Cir. 2000); *United States v. Binion*, 570 F.3d 1034, 1041 (8th Cir. 2009) (citing *United States v. Aldaco*, 477 F.3d 1008, 1016 (8th Cir. 2007)). The requirement to administer warnings in advance only attaches to statements which are the product of custodial interrogation. *Innis*, 446 U.S. at 291-301.

▮ To determine whether a confession is voluntary, a court considers the totality of the circumstances and looks at conduct of officers and characteristics of the accused. *United States v. Muhlenbruch*, 634 F.3d

987, 998 (8th Cir. 2011) (citing *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004)). Castillo concedes that no question was directed to him by the arresting officer but insists that his statement was elicited through threats and coercion. Under the Fifth Amendment "[a] statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *LeBrun*, 363 F.3d at 724 (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)). No evidence exists in the trial record of the present case which suggests that police officials or the U.S. Marshals coerced, threatened, or bribed Castillo into giving his incriminating statements on April 12, 2007 in the Frenchtown area.

On April 12, 2007, a marshal observed Castillo standing on a rock in a secluded area that required passage through thick bushes to access. (J.A. Vol. IV at 49-50.) After locating Castillo, and being unsure if Castillo was a flight risk, the officer unholstered his gun and announced "US Marshal! Freeze!" (J.A. Vol. IV at 51-52.) Castillo complied by putting his hands upward and announcing that he was unarmed. (J.A. Vol. IV at 52.) When the marshal verified that Castillo had no weapons, he reholstered his weapon. At that juncture, Castillo spontaneously said "I killed the little girl [L.H.]." (J.A. Vol. IV at 16.) The marshal immediately placed Castillo under arrest and reached into his pocket for a card with the *Miranda* rights written on it. After he retrieved the card, the marshal read Castillo his *Miranda* rights.

 ██ There is nothing in the marshal's conduct that suggests a threat, coercion, or bribery. No evidence exists in the trial record that suggests that any law enforcement official assumed a hostile, truculent, or bellicose posture towards Castillo after he was taken into custody. There was no verbal altercation between Castillo and the U.S. marshals at that time of his April 12, 2007 arrest. The marshal effectuated an arrest in a routine fashion. Furthermore, the United States Supreme Court has opined that "the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Innis*, 446 U.S. at 300. The U.S. Marshal did not question or interrogate Castillo before Castillo gave the incriminating statements. Therefore, because there was no custodial interrogation of Castillo when he uttered his admission to the murder of L.H., there was no implication of the *Miranda* warnings.

Consequently, we reject Castillo's contention that his Fifth Amendment rights were violated on April 12, 2007 when he spontaneously, and without interrogation, admitted to killing L.H.

### 3. Castillo's right to have an attorney present during questioning by law enforcement officials was not violated.

 The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense. U.S. CONST. amend. VI. In *Miranda*, the Supreme Court held that once a defendant in custody asks to speak with a lawyer, all interrogation must cease until a lawyer is present. *Miranda*, 384 U.S. at 444-45. At trial, the U.S. marshal testified that he read Castillo his rights from the card that was in his pocket. The marshal read the rights from the card, which was admitted in evidence, and the rights card stated in pertinent part:

> You have a right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning . . . . If you cannot afford a lawyer, one will be appointed for you if you wish before questioning begins. [I]f you decide to answer any questions without a lawyer present you still have the right to stop answering at any time . . . . until you talk to the lawyer.

(J.A. Vol. IV at 57.) Additionally, after each segment of the reading of the *Miranda* rights, Castillo was asked if he understood what was read to him, and each time Castillo answered in the affirmative. Castillo waived his right to a lawyer by informing the marshal that he did not want a lawyer and instead asserted that he wanted to confess to L.H.'s murder. (J.A. Vol. IV at 57.) Therefore, there was no violation of Castillo's Sixth Amendment rights.

### B. Castillo was subject to multiple punishments for the same crime.

 Castillo asserts that he was subject to multiple prosecution and punishment for the same offense in violation of Virgin Islands law and the double jeopardy clause of the Fifth Amendment. The United States Supreme Court has noted that the Fifth Amendment guarantee against double jeopardy protects against a second prosecution for the same offense after acquittal, protects against a second prosecution for the same offense after conviction, and protects against multiple punishments for the

same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969). Castillo argues that he received multiple punishments for the same offense because "the Information recite[s] the same facts and arose out of the same alleged unlawful act." (Appellant's Br. at 19.)

█ Title 14, section 104 of the Virgin Islands Code controls whether two offenses are the "same offense" for the purposes of punishment under the Fifth Amendment in the Virgin Islands, and states:

> An act or omission which is made punishable in different ways by different provisions of this Code may be punished under any of such provisions, but in no case may it be punished under more than one. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other.

*See generally Ward v. People*, 58 V.I. 277, 283-84 (V.I. 2013). Additionally, the United States Supreme Court, in *Blockburger v. United States*, 284 U. S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), elucidates the rule on the Double Jeopardy Clause in these instances. "The applicable rule is that, where the same act or transaction constitute a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision require proof of a fact which the other does not." *Id.* at 304. "However, it has subsequently clarified that the *Blockburger* test 'is a rule of statutory construction, and because it serves as a means of discerning [legislative] purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent.' " *Ward*, 58 V.I. at 285 n.5 (quoting *Albernaz v. United States*, 450 U.S. 333, 340, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981)).

█ The counts to which Castillo refers both read:

> On or about April 6, 2007 and April 11 2007 in St. Thomas, U.S. Virgin Islands, **Daniel C. Castillo**, unlawfully killed a human being with malice aforethought, by choking [L.H.], a twelve year old girl, to the point of strangulation and causing her death . . .

(J.A. Vol. I at 31.) The language in the count informs whether it was second degree murder, in violation of title 14, section 921, 922(b) or aggravated child abuse in violation of title 14, section 506(3). Castillo was charged with second degree murder which resulted in a conviction for the lesser included

268

offense of voluntary manslaughter. Under title 14, section 924, voluntary manslaughter is "the unlawful killing of a human being without malice aforethought . . . upon a sudden quarrel or heat of passion." Under title 14, section 506, a person perpetrates an act of aggravated child abuse or neglect if he inflicts serious physical, mental or emotional injury upon a child, or maltreatment, sexual conduct with or exploitation of a child and the child dies from such abuse or neglect. *See also* 14 V.I.C. § 503 (providing definitions for terms appearing in 14 V.I.C. § 506). The facts, as enumerated in the Information, are sufficient to charge crimes under both statutory provisions. In interpreting title 14, section 104 of the Virgin Islands Code, we have previously held that although "an individual can be charged and convicted of violating multiple provisions of the Virgin Islands Code, that individual may only be punished for one offense for each discrete act or indivisible course of conduct." *Castor v. People*, 57 V.I. 482, 497 (V.I. 2012) (citing *Williams v. People*, 56 V.I. 821, 832 (V.I. 2012)).

██ ██ Here, Castillo was sentenced to life imprisonment on his conviction for voluntary manslaughter and thirty years on his conviction for aggravated child abuse, with both sentences to be served concurrently. Since Castillo was punished for both crimes, if there were only a single act or indivisible course of conduct, these sentences would be impermissible under section 104, even though the sentences would be served concurrently. *See Williams*, 56 V.I. at 832 (citing *Ball v. United States*, 470 U.S. 856, 864-65, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985)) (multiplicitous convictions constitute impermissible punishment, even if sentences are served concurrently and no greater sentence results). The trial court was prohibited from punishing Castillo for two offenses arising from the same act and there was only one act before the trial court. Therefore, we are compelled to remand the case to the Superior Court for resentencing in accordance with title 14, section 104 because there is only one single act by Castillo before the Court. As we have recently noted, the proper procedure is for "the Superior Court to announce a sentence for [each] offense and to subsequently stay execution of the sentences in which section 104 is implicated." *Williams v. People*, 58 V.I. 341, 354 n. 10 (V.I. 2013).

## C. No error was committed in applying the Habitual Criminals Statute and the statute is constitutional.

Castillo asserts that because the conviction for voluntary manslaughter was erroneous the government could not apply that conviction in

considering the application of 14 V.I.C. §61(b), sometimes referred to as the habitual criminals statute. Additionally, he contends that since the People did not include the crime of aggravated child abuse in the Information, nor did the trial court apply it in sentencing, section 506(3) cannot now be applied retroactively because aggravated child abuse is not a crime of violence. Castillo further argues that the habitual criminals statute is unconstitutional, and that it violates the Fifth and Fourteenth Amendments Due Process Clauses and the Eighth Amendment prohibition against cruel and unusual punishment. For these reasons, Castillo alleges that his conviction and sentence should be vacated. We have already established that Castillo's conviction for voluntary manslaughter is affirmed; therefore, we reject Castillo's first contention that his conviction for voluntary manslaughter should not be considered in applying the habitual criminals provision of 14 V.I.C. §61(b).

 Following trial, Castillo was sentenced to life imprisonment for his conviction of voluntary manslaughter after the trial court applied the habitual criminals provision of the Code because of his previous conviction for third degree assault.[2] The pertinent provision reads:

> Whoever, whether under the laws of the Virgin Islands, the United States or a state or territory thereof, or any other jurisdiction, has been convicted of an offense which would be a felony in the Virgin Islands and a crime of violence as defined in Title 23, section 451(e) of the Code shall upon a subsequent conviction of a felony in the Virgin Islands, which is also a crime of violence as defined in the aforementioned provision, be incarcerated for a term of imprisonment of not less than ten years as provided in subsection (a) of this section, or not less than one-half the maximum sentence provided by law, whichever is greater, and may be incarcerated for the remainder of his natural life if the subsequent felony for which the person is convicted in the Virgin Islands, which is also a crime of violence as defined in Title 23, section 451(e) of the Virgin Islands Code, was committed within ten (10) years after the date the person has completed serving his sentence on the conviction for the prior felony and crime of violence. Imposition or execution of this minimum period of incarceration shall not be sus-

---

[2] Castillo had been convicted upon his plea of guilty to a charge of Assault in the Third Degree in violation of 14 V.I.C. §297(2) in a Judgment and Commitment dated August 28, 2006.

pended, nor shall probation be granted; neither shall parole or any other form of release be granted for this minimum period of incarceration.

14 V.I.C. § 61(b). This statute provides that it shall be applied to persons who commit a crime of violence as defined in V.I. CODE ANN. tit. 23, § 451(e) (1970) which states:

> "Crime of violence" means the crimes of, or an attempt to commit, murder in any degree, *voluntary manslaughter*, rape, arson, discharging or aiming firearms, mayhem, kidnapping, assault in the first degree, assault in the second degree, assault in the third degree, robbery, burglary, unlawful entry and larceny. (emphasis added)

Both crimes, voluntary manslaughter and third degree assault, are considered crimes of violence under this statute. Under the Virgin Islands Code, title 14, section 925, voluntary manslaughter has a maximum prison sentence of ten years and under title 14, section 297(2), third-degree assault has a maximum prison sentence of five years.

 In assessing the constitutionality of the habitual criminals provision, we will determine whether the statute is unconstitutional on its face or as applied in this case. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2665-66, 180 L. Ed. 2d 544 (2011) (discussing *Los Angeles Police Dept. v. United States Reporting Publishing Corp.*, 528 U.S. 32, 40-41, 120 S. Ct. 483, 145 L. Ed. 2d 451 (1999)). Based on the text of the Habitual Criminals Statute, it is obvious that when utilizing the statute, the legislature intended for the trial courts to impose a greater punishment on repeat offenders or recidivists than on first time offenders. The statute is very succinct and detailed regarding how it should be applied to those convicted of certain crimes. The above provision is one of several enactments that detail the manner in which the statute is to be applied. The legislature's failure to statutorily provide the exact penalties for specific repeat offender crimes is not to be interpreted as the statute being vague but rather as assigning the application of the statute to the discretion of the sentencing judge.

 The United States Court of Appeals for the Third Circuit ("Third Circuit") has held on numerous occasions that in applying the habitual criminal statute it is within the court's discretion to determine the length of the sentence to be imposed. *Gov't of the V.I. v. George*, 969 F.2d 22,

24-25, 27 V.I. 424 (3d Cir. 1992). The Third Circuit observed that in *Solem v. Helm*, 463 U.S. 277, 289-90, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983), the United States Supreme Court opined, "outside the context of capital punishment, successful challenges of the proportionality of particular sentences [will be] exceedingly rare." *Gov't of the V.I. v. Ramos*, 730 F.2d 96, 98 (3d Cir. 1984). The Court explained in *Rummel v. Estelle*, 445 U.S. 263, 284, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980) that the primary purposes of a recidivist statute "are to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time." The juncture at which the recidivist has demonstrated his criminal proclivities and the length of an enhancement "are matters largely within the discretion of the punishing jurisdiction." *Id.* at 285.

Here, the sentencing judge imposed a life sentence upon Castillo for his conviction of voluntary manslaughter as a repeat offender. Castillo argues that this punishment was disproportionate to the crimes which he committed. In support of his argument, Castillo cites to *Ramos* and *George*, two Third Circuit cases which originated in the Virgin Islands and which address the issue of proportionality. These cases upheld the constitutionality of the habitual criminals provision; however, Castillo seeks to distinguish those two cases from this case based on proportionality. Castillo contends that after applying the habitual criminals provision in this case, neither of the sentences warrants life imprisonment. Consequently, he concludes that his life sentence was disproportionate to the punishment for the crime of voluntary manslaughter and it constitutes cruel and unusual punishment. However, Castillo ignores the crimes for which Ramos and George were convicted, ignores the circumstances in their cases, and ignores the discretion of the trial judge in weighing these factors.

██ ██ Castillo was convicted of voluntary manslaughter for his action which resulted in the death of a child, and he was previously convicted of third degree assault. Both voluntary manslaughter and third degree assault have been characterized by the legislature as "crimes of violence" and a judge has discretion to impose a sentence up to life imprisonment on one who has, on more than one occasion committed these crimes of violence. *See Rummel*, 445 U.S. at 265-66 (Court upheld life sentences under recidivist statute based on prior convictions for fraud

and forged check reasoning that the length of sentence for crimes which constitute felonies are within the legislature's purview.) We conclude that the habitual criminals provision as codified in title 14, section 61 of the Virgin Islands Code is constitutional. Furthermore, we find that the trial court properly exercised its discretion in this case.

██ ██ Castillo also asserts that his Eighth Amendment right against cruel and unusual punishment was violated when the Habitual Criminal Statute was applied to his sentences. (Appellant's Br. 26.) This Court has addressed this argument before in multiple cases. As before, we will consider " 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue." *Codrington v. People*, 57 V.I. 176, 196 (V.I. 2012) (*citing Graham v. Florida*, 560 U.S. 48, 61, 130 S. Ct. 2011, 2022, 176 L. Ed. 2d 825 (2010) (quoting *Roper v. Simmons*, 543 U.S. 551, 563, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)). If consensus is found, the Court "must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Id.* (citation omitted). The statute before us is a sentence enhancement. Although they may be referred to by numerous other names, sentence enhancements are a common statute created by legislatures throughout the United States. The concept and legality of these enhancement statutes was discussed in Part X of this Opinion. Castillo has presented no evidence to the contrary; therefore this statute is not facially unconstitutional.

██ We must also consider if the Eighth Amendment is violated as it is applied directly to Castillo. The question for the Court is one of proportionality; is the sentence proportional to the crime committed? *Id.* at 197. Castillo argues that the sentence is disproportionate in light of the fact that the previous felony was assault in the third degree. The Third Circuit, citing to the United States Supreme Court has said, "[o]utside the context of capital punishment, successful challenges of the proportionality of particular sentences will be exceedingly rare." *Gov't of V.I. v. Ramos*, 730 F.2d 96, 98 (3d Cir. 1984) (citing *Solem v. Helm*, 463 U.S. 277, 289-90, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983)). In *Harmelin v. Michigan*, 501 U.S. 957, 997, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991), the Supreme Court stated that the Eighth Amendment "does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the

crime." In this matter we have the death of a twelve year old girl at the hands of a convicted felon who placed her lifeless body in a trash can. The Supreme Court has upheld 25 years to life or life sentences for significantly less dangerous and sometimes nonviolent crimes. *Id.* (sentenced to life without parole for possessing a large quantity of cocaine); *Ewing v. California*, 538 U.S. 11, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003) (defendant sentenced to 25 years to life for the theft of a few golf clubs due to the state's three-strike recidivist statutory scheme); *Rummel v. Estelle*, 445 U.S. 263, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980) (Texas recidivist statute that enhanced third felony conviction for obtaining money by false pretense to a mandatory life sentence did not constitute cruel and unusual punishment); *Lockyer v. Andrade*, 538 U.S. 63, 77, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003) (defendant's conviction under California's third strike law was not grossly disproportional). Castillo's sentence under the Habitual Criminal Statute does not violate his Eighth Amendment right.

Castillo alternatively argues that the prosecutor was vindictive and filed the habitual criminal information in an effort to punish Castillo for his successful acquittal of the second degree murder charge. Castillo did not raise this issue before the trial court; therefore, we review only for plain error. Under the plain error standard, if there is (1) an error, (2) that is plain, and (3) that affects substantial rights, we will only reverse if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Galloway v. People*, 57 V.I. 693, 699 (V.I. 2012); *Francis v. People*, 52 V.I. 381, 390 (V.I. 2009); *see also Johnson v. United States*, 520 U.S. 461, 466-67, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997).

Castillo's contentions, however, are contrary to the law regarding vindictive prosecution. The trial court must determine whether the People's action of applying the Habitual Criminals Statute was motivated by prosecutorial vindictiveness. In claims of vindictive prosecution, the defendant has the burden of proof and must establish either

> (1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness. Thereafter, the burden shifts to the prosecution to justify its decision with legitimate, articulable, objective reasons. If the defendant does not meet his burden of proof, however, there is no need to reach the government justification issue.

*Whiteplume v. State*, 874 P.2d 893, 896 (Wyo. 1994) (quoting *United States v. Raymer*, 941 F.2d 1031, 1040 (10th Cir. 1991)). Where a defendant has exercised a legal right and the government responds in a way that punishes him for taking such action, an improper vindictive motive is presumed. *United States v. Goodwin*, 457 U.S. 368, 373-74, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982). The presumption arises when the government acts by imposing increased charges, such as changing a charge from a misdemeanor to a felony or subjecting him to the possibility of a greater sentence or in some other way "upping the ante." *Blackledge v. Perry*, 417 U.S. 21, 28, 94 S. Ct. 2098, 40 L. Ed. 2d 628 (1974). But there will be no presumption of vindictiveness where the defendant fails to show prosecutorial retaliation. *United States v. Bucci*, 582 F.3d 108, 114-15 (1st Cir. 2009).

██ ██ Neither of these circumstances is present in this case. First, after the jury convicted Castillo of voluntary manslaughter, the prosecutor submitted the habitual criminal information in accordance with the explicit language of title 14, section 61. Castillo argues that the fact that the prosecutor chose to file the information for habitual offender status after the trial ended confirms the prosecutor's vindictive nature. However, this argument is spurious, considering that Castillo had one prior conviction before the verdict and his status as a habitual criminal only came to fruition after the guilty verdict in this case. In *United States v. Cooper*, 461 F.3d 850, 856 (7th Cir. 2006), the court held that even where the sentence enhancement is sought in pretrial plea negotiations, if there is no evidence of prosecutorial animus, there is no prosecutorial vindictiveness. This illustrates the lack of animus in the prosecutor's actions, as the statute was not applied in anticipation of Castillo's conviction but was applied after his conviction; therefore, the application of the statute was fair and just. No evidence exists in the record confirming that the prosecutor acted other than in accordance with the purpose of and in compliance with the habitual criminals provision.

██ Secondly, second degree murder as charged in the original Information, upon conviction, presented Castillo with the possibility of life imprisonment, similar to the possibility presented under the habitual criminals provision. Therefore, Castillo was not subject to any greater punishment through the filing of an enhanced charge pursuant to the habitual criminals statute. Furthermore, the power to make decisions to charge a particular crime is reposed within the discretion of the prosecutor. *Billis v. State*, 800 P.2d 401, 417 (Wyo. 1990). A charging

decision is not "improper unless it results solely from the defendant's exercise of a protected legal right, rather than the prosecutor's normal assessment of the societal interest in the prosecution." *Goodwin*, 457 U.S. at 380 n.11 (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978) and *Oyler v. Boles*, 368 U.S. 448, 456, 82 S. Ct. 501, 7 L. Ed. 2d 446 (1962)). Castillo has failed in his burden of proving that the prosecutor acted vindictively in filing the habitual criminal information; therefore, there is no need to shift the burden to the People to prove otherwise. We find no error in the trial court's application of the habitual criminals statute.

## D. Castillo waived his right to appeal the failure to give an intoxication instruction.

Castillo argues that the trial court erred when it failed to give the jury an intoxication instruction during the final jury instructions. It is noteworthy that the defense never objected to the trial court's failure to give a final instruction regarding intoxication. Importantly, Castillo's counsel never requested such an instruction or filed one with the court prior to the jury being instructed. The trial record discloses that Castillo irrefutably agreed with and had no objection to the trial court not giving an intoxication instruction. The following colloquy during a jury instruction conference is instructive:

> THE COURT: Okay, I got the instructions from Attorney Willocks with respect to intoxication and I am having two problems. I will hear from Counsel.
>
> Number one, there is no evidence that the Defendant was intoxicated. He said that he had two elephant beers and some weed. That does not rise to any evidence that he was intoxicated or that they smelled alcohol; that he was stumbling and falling down.
>
> How am I supposed to give that? It cannot go to second degree. It could only go to first degree. You are giving me all this stuff about premeditation. Were you here yesterday when I threw out the other one?
>
> . . . .
>
> ATTORNEY WILLOCKS: Your Honor, I'm in agreement with the Court.
>
> THE COURT: That's good. I want you to get to the point.

ATTORNEY WILLOCKS: I do agree with the Court, and I have no objection if the Court doesn't give the instruction on intoxication.

(J.A. Vol. III, at 2.) The trial record confirms that Castillo waived his right to appeal the failure to give an intoxication instruction. *See, e.g., Latalladi v. People*, 51 V.I. 137, 143-44 (V.I. 2009) ("a defendant cannot complain on appeal of alleged errors invited or induced by himself, for if there was any error at all, it was 'invited error' and cannot now be the basis for reversal.") (citations omitted). Therefore, we will not address whether the court erred in not giving an intoxication instruction.

### E. The evidence presented was sufficient to sustain Castillo's convictions.

Castillo argues that the evidence was insufficient to sustain his convictions. Castillo argues that there were "no eye witnesses, no DNA evidence or credible physical evidence that would establish for a rational trier of fact each essential element beyond a reasonable doubt for the crimes charged against Castillo." (Appellant's Br. at 33.)

A highly deferential standard of review will be given to the jury's verdict when a defendant challenges the sufficiency of the evidence. *Castor*, 57 V.I. 482, 488 (V.I. 2012); *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009); *United States v. Kellogg*, 510 F.3d 188, 202 (3d Cir. 2007). We will " 'examine the totality of the evidence, both direct and circumstantial,' and 'interpret the evidence in the light most favorable to the government as the verdict winner.' " *United States v. Pavulak*, 700 F.3d 651, 668 (3d Cir. 2012) (quoting *United States v. Miller*, 527 F.3d 54, 60, 62 (3d Cir. 2008)); *see also Ramirez v. People*, 56 V.I. 409, 417 (V.I. 2012). The jury's verdict will be upheld if there is substantial evidence from which a reasonable trier of fact could find, beyond a reasonable doubt, the essential elements of the crime. *Christopher v. People*, 57 V.I. 500, 514-15 (V.I. 2011); *see also Miller*, 527 F.3d at 60. We do not judge the credibility of a witness nor weigh the evidence. *Smith v. People*, 51 V.I. 396, 401 (V.I. 2009) (citing *United States v. Carr*, 25 F.3d 1194, 1201 (3d Cir. 1994)).

Castillo gave a detailed confession to law enforcement authorities on how he murdered L.H. Castillo argues that because this statement was obtained in violation of his Fourth and Fifth Amendment constitutional right, it should not have been admitted into evidence and without the

statement there is no evidence linking him to the crimes charged. However, as previously discussed in this Opinion, neither of Castillo's April 12, 2007 statements were obtained in violation of the Fourth or Fifth Amendments to the United States Constitution. Therefore, these statements were properly admitted into evidence and qualified as evidence the jury considered in reaching its decision.

On April 12, 2007, Castillo admitted that he met L.H. in the Housing area and told her to come by his place on Eighth Street to retrieve her uncle's belongings. While at the house on Eighth Street Castillo began packing the belongings while simultaneously informing L.H. that her mother was a "bitch." L.H. responded by slapping Castillo. Castillo further confessed that he placed his hand around L.H.'s neck and choked her until she was not breathing. He admitted that after she died, he took her body to a shed and put her in a tub. Eyewitnesses informed law enforcement officers that they saw L.H. walking with a man that fit the description of Castillo on the day she went missing. The medical examiner also testified that the cause of death of L.H. was strangulation, which is consistent with Castillo's statement that he choked L.H. until she stopped breathing. (J.A. Vol. II at 91.) L.H.'s body was found in the shed where Castillo admitted he hid her body. Importantly, L.H.'s body was found in the structure that Castillo resided at the time of L.H.'s death. We find that this confession along with the corroborating evidence was substantial and sufficient evidence whereby the jury could reasonably have found Castillo guilty beyond a reasonable doubt for the crimes charged.

### F. The admission of underwear evidence was not prejudicial.

Castillo argues that the trial court erred in admitting evidence regarding L.H.'s panties or underwear because "[t]here was no evidence of sexual contact with L.H. by Castillo and no such charges were filed." (Appellant Br. at 34.) The evidence which Castillo references was included in the medical examiner's report. The report stated that the body was found covered with a green bedspread and a pink pillow case. It further stated that the body that was removed from the premises where Castillo resided was a twelve-year-old black girl weighting approximately 80 to 90 pounds and wearing a soiled pink dress, a bra, and a butterfly ring. The report also stated that no panties were found on her body. (J.A. Vol. VII at 12.)

The People argued at trial that this report was necessary to impeach Castillo's statement that L.H. did not show Castillo her private parts when they were at Eighth Street and that L.H. was wearing blue short pants when she was placed in the tub. Castillo's confession stated in part that he took L.H.'s glasses and slippers and put them in the bin and that she was wearing a pink dress, a blue short pants under the dress and that he covered the bin with a maroon sheet. (J.A. VII at 6.) The People wanted to dispute the fact that L.H. had no panties on her person when her body was recovered. This fact, coupled with the manner in which Castillo placed her in the box, strongly inferred that Castillo must have seen her private parts and that Castillo's statement that L.H. was wearing blue short pants was incongruous in to the manner in which her body was recovered.

While Castillo does not contest the admission of the statement regarding whether L.H. showed Castillo her private parts, Castillo argues that the statement regarding whether L.H. was wearing panties, serves no other purpose than to be prejudicial because Castillo made no mention of panties in his confession. Castillo argues that blue short pants were referenced in his confession and therefore the only way this statement could be impeached is by referencing blue short pants rather than panties.

Under Rule 401 of the Federal Rules of Evidence, evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Generally all relevant evidence is admissible and irrelevant evidence is inadmissible. FED. R. EVID. 402.[3] Castillo was charged with murder under 14 V.I.C. §§ 921, 922(b) and aggravated child abuse under 14 V.I.C. § 506(3). The elements for murder and child abuse, as charged in the Information, do not require proof of any type of sexual

---

[3] At the time of Castillo's trial, the Uniform Rules of Evidence under Title 5 were in effect and as such were the governing law on admissibility of evidence. The relevant language as applied here was codified under sections 771 and 772 of the Virgin Islands Code. The Federal Rules of Evidence were adopted by the Legislature on March 26, 2010 and signed into law by the Governor on April 7, 2010, a few years after the adjudication of Castillo's trial, and have now become the law governing evidentiary matters. Nevertheless, the language of the Uniform Rules and the Federal Rules of Evidence as applied here are fundamentally the same, and neither party suggests that there is any difference which affects the analysis in the present appeal. Therefore, use of the Federal Rules of Evidence and federal case law analysis are appropriate in analyzing this issue.

contact. Nevertheless, as mentioned previously, the People argued that the testimony was offered to impeach Castillo's statement and not for the proof of any fact regarding the elements of the crime. The trial court considered the arguments of both the People and the defense and ruled as follows:

> With respect to the balancing analysis, they're articulated in *Government vs. Archibald*, 987 F.2d 180, 28 V.I. 228 (3d Cir. 1993) where the Federal Rule of Evidence challenge is made. Such balancing analysis should be made on the record and I will make it here.
>
> Counsel for the Defense states the medical examiner's observation that no panties were found on the body should be stricken by the autopsy report because the testimony would be violative of 403 because the probative value is substantially outweighed by the danger of being prejudiced.
>
> Under the first hurdle, the Court finds that the medical examiner's statement is relevant for impeaching the defendant's credibility regarding some aspects of his confession but not for showing that some impermissible or some inappropriate sexual activity took place between [L.H.] and the defendant because as I have stated the People failed to charge the Defendant with felony murder during the commission of rape and in Count Three, Child Abuse includes sexual contact with a child and that was not charged.
>
> Physical injury, clearly, the People have to prove beyond a reasonable doubt that the defendant did not act in self-defense as suggested and raised in his confession. Further, they must prove premeditation or second degreed [sic] murder, too. That is an uphill battle since the People must prove that the killing of [L.H.] did not occur exactly as the Defendant said it did. To do that the People can only show that part of the Defendant's statement is true.
>
> It is conceded that since the Defendant said in his statement that he placed [L.H.] in a blue tub, and when he placed her in the blue tub, she was wearing [a] s[h]ort blue pants under her dress.
>
> Certainly, Dr. Landron can be asked if her body was found with blue short pants on because the Court believes it would be grossly misleading to just permit Dr. Landron to say that no blue short pants were found on the body because the jury may weigh that discrepancy as being insignificant since they could make the implication that under pants were on the body.

Part of my credibility instruction is inconsistencies or discrepancies in the testimony of a witness or between the testimony of a different witness may or may not cause you to believe or discredit such testimony. In weighing the effects of that discrepancy; however, you will consider whether it pertains to matters of importance or an insignificant detail, and consider whether the discrepancy resulted in innocent error or intentional falsehood.

It's the Court's findings that the probative value impeachment testimony is not substantially outweighed by the dangers of unfair prejudice and that the Court's curative and limited instruction further minimizes the prejudice to the defendant.

(J.A. Vol. II at 41-45.) According to the trial court, in conducting its probative value verses unfair prejudice balancing test, *see* FED. R. EVID. 403, the entire autopsy report was necessary to help the Government prove murder beyond a reasonable doubt given that the defense of self-defense was suggested in Castillo's confession. The trial court stated that the People needed to prove the absence of self-defense by presenting evidence that part of Castillo's confession was not true.

While the trial court appropriately undertook the probative value verses unfair prejudice balancing, it remains unclear how the evidence that L.H. did not have panties or underwear on when her body was found was necessary to rebut a claim of self-defense. In his confession, Castillo asserted that after telling L.H. that her mother was a "bitch," L.H. hit him twice before he proceeded to strangle her. This portion of Castillo's confession seems to be the suggestion in accord with the self-defense proposition. However, as noted before, the People as well as the trial court asserted that the underwear evidence was admissible to rebut Castillo's statement that he placed her in the tub with blue short pants on and that she did not show him her private parts. It is not clear from the record how this portion of the confession implicates the claim of self-defense whereby the evidence of the underwear would be necessary to rebut such a claim.

Indeed, it is inconceivable how the evidence of the underwear from the autopsy report had any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable. FED. R. EVID. 401. Consequently, we find that the evidence of the underwear in the autopsy report was not relevant and

281

therefore inadmissible. Nevertheless, we conclude that considering all the evidence in the case the admission of the underwear evidence was not prejudicial to Castillo's constitutional rights warranting a reversal of the jury verdicts. *See, e.g., Smith v. People*, 55 V.I. 957, 963 (V.I. 2012) (admission of irrelevant and inflammatory evidence was harmless as it was "highly probable that the evidence . . . did not contribute to the jury's judgment of conviction.") *See also United States v. Lee*, 612 F.3d 170, 189 (3d Cir. 2010) (same). Although the underwear evidence could potentially have inflamed the jury, Castillo's confession and the forensic evidence, presented by the People, minimize any harm that may have resulted from the underwear evidence.

## G. The record is inadequate for a determination on Castillo's argument of ineffectiveness of counsel.

██ █ Castillo argues that he was denied his Sixth Amendment right to effective counsel. As previously noted, the Sixth Amendment to the United States Constitution provides the accused the right to have assistance of counsel for his defense in criminal prosecutions. To succeed on a claim for ineffective assistance of counsel, a defendant who was convicted must prove that his "counsel's performance fell below an objective standard of reasonableness and that counsel's performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome in the proceeding." *Stanislas v. People*, 55 V.I. 485, 494 (V.I. 2011) (citing *Strickland v. Washington*, 466 U.S. 668, 694, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)); *see also Corraspe v. People*, 53 V.I. 470, 479-80 (V.I. 2010). In making the claim, an appellant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. As Castillo notes in his brief, this Court does not review a claim for ineffective assistance of counsel on direct appeal unless the necessary facts to support the claim are evident from the record on appeal. *Corraspe*, 53 V.I. at 486.

Castillo proffers several reasons why he was denied effective assistance of counsel. Castillo argues that his trial counsel was "deficient in (1) failing to investigate the factual basis for appellant's claim of innocence — wherein Castillo pointed to another individual, D.G., who was purportedly responsible for L.H.'s death, and (2) failing to present evidence of Castillo's innocence at trial, including the failure to call D.G.

and another person as witnesses who could have potentially offered exculpatory evidence." (Appellant's Br. at 36.) Castillo also claims that because his trial counsel believed a conflict of interest existed between Castillo and D.G., who the attorney previously represented, the attorney could not effectively represent his interests.

In support of these claims, Castillo asserts that he informed trial counsel that D.G. was responsible for the death of L.H. However, according to Castillo, trial counsel failed to investigate this claim. During the hearing on Castillo's attorney motion to withdraw due to a conflict of interest regarding D.G., Castillo's attorney noted that DNA material was discovered on the crime scene as belonging to an unidentified person who could be D.G. Castillo asserts that his trial counsel was then ordered by the trial court to file a motion in limine showing how he intended to implicate D.G. Apparently, a motion in limine was never filed by Castillo's trial counsel. However, there is little information on the reasoning for not filing the motion in limine, whether because of trial strategy, lack of evidence, or lack of diligence by the attorney.

 Castillo also claims that his attorney did not call Leanna Natta as a witness. Castillo claims that Natta saw L.H. with two men — one fitting the description of D.G. on the day L.H. disappeared. Although Castillo makes these broad claims, he fails to support any of them with evidence nor is there any evidence in the trial record of what his trial counsel did or failed to do in regards to Castillo's claims. Consequently, this Court is unable to assess whether the·claim is colorable, and whether the extent, if any, to which the claim was investigated by trial counsel was so deficient as to amount to ineffective assistance of counsel. *See, e.g., United States v. Anderson*, 570 F.3d 1025, 1032 n.4 (8th Cir. 2009) ("We will consider an ineffective assistance of counsel claim on direct appeal only in exceptional cases where the district court has developed a record on the ineffectiveness issue or where the result would otherwise be a plain miscarriage of justice. Neither exception applies in this case; therefore, we decline to address [the] ineffective assistance claim.") ·

Further, Castillo's claim that his attorney's conduct was affected by his belief that there was a conflict of interest also cannot be determined without evidence of the relationship between Castillo's trial counsel and his representation of D.G. as an attorney within the office of the Public Defender. Consequently, the record is currently inadequate for this court to make a determination on Castillo's claim of ineffective assistance of

counsel. This determination, however, will not preclude Castillo from seeking relief in a collateral proceeding.

## VI. CONCLUSION

For the foregoing reasons we affirm the Judgment and Commitment dated September 5, 2008 of the trial court on both counts. However, we remand for the limited purpose of resentencing in accordance with title 14, section 104 of the Virgin Islands Code.

HODGE, *Chief Justice*, concurring. I agree with the majority's conclusion that the trial court violated Castillo's rights pursuant to section 104 of title 14 when it prescribed two separate punishments for second-degree murder and aggravated child abuse because those offenses were based on a single act. However, I write separately because I believe that the Court's decision — like Castillo's brief — erroneously conflates Double Jeopardy analysis with section 104 analysis.[1]

The resolution of Castillo's Double Jeopardy claim does not require consideration of section 104. Instead, his Double Jeopardy claim is meritless because Castillo was tried and convicted of multiple offenses, each of which required proof of a fact the other did not. *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932) (noting that where "a same act or transaction constitutes a violation of two distinct statutory provisions," a Double Jeopardy violation occurs only when those two provisions constitute the same offense; that is, where neither provision requires proof of a fact different than, or in addition to, the other provision). This conclusion is dispositive of the Double Jeopardy question.

Two provisions of the criminal code may not constitute the "same offense," yet they may be based on a single act. In such circumstances, the Double Jeopardy Clause is not offended. *See Goodman v. State*, 601 P.2d

---

[1] Section 104 and the Fifth Amendment's Double Jeopardy Clause are related, but not the same. The Double Jeopardy Clause protects criminal defendants against multiple prosecutions or punishments for a single *offense* — unless the Legislature has clearly intended to permit cumulative punishment. Section 104, on the other hand, speaks to multiple *punishments* for the same *act. Compare* U.S. CONST. amend. V (providing that no person shall "be subject *for the same offense* to be twice put in jeopardy of life or limb") (emphasis added) *with* 14 V.I.C. § 104 (noting that an *act*, though violative of multiple provisions of the Code, may be *punished* under only one). The distinction, then, and one which must be kept clear, is between a singular offense and a singular act.

178, 185 (Wyo. 1979) ("Two or more distinct offenses may emanate from the same transaction or act, and the rule that a person cannot be put twice in jeopardy for the same offense has no application where two separate and distinct crimes are committed by one and the same act."). Section 104, on the other hand, would be violated if a defendant was punished under both provisions. As this Court has previously made clear, section 104 offers protection greater than, and in addition to, the Double Jeopardy Clause, *Rawlins v. People*, 58 V.I. 261, 275-76 (V.I. 2013) (stating that section 104 "provides greater protections than the Double Jeopardy Clause of the United States Constitution"), and so a section 104 challenge should be addressed separately from any Double Jeopardy analysis.

Here, I agree with the Court's decision that Castillo was convicted of two offenses based on the same act,[2] and, therefore, pursuant to section 104, he may be punished for only one. Consequently, I agree that we should remand the case for resentencing. However, I cannot agree with the majority's conflation of section 104 of title 14 with the Double Jeopardy Clause. For this reason, while I join the Court's decision as to each other part of the Opinion, as to Section V.B., I concur only in the result.

---

[2] In both Count I — the second-degree murder count — and Count II — the aggravated child abuse count — Castillo was charged with "choking [L.H.], a twelve year old girl, to the point of strangulation and causing her death." (J.A. Vol. I at 31.) Consequently, it is clear that both offenses were based on a single act.